**UNITED STATES of America, Plaintiff,**

v.

**CONTAINER CORPORATION OF AMERICA et al., Defendants.**

**No. C–180–G–63.**

United States District Court
M. D. North Carolina,
Greensboro Division.

Aug. 31, 1967.

---

William H. Murdock, U. S. Atty., Greensboro, N. C., Lewis Bernstein, Wharey M. Freeze, Gregory B. Hovendon and Peter J. Adang, Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Whitney North Seymour, William J. Manning, and James W. Harbison, Jr., of Simpson Thacher & Bartlett, New York City, and Ralph M. Stockton, Jr., of Hudson, Ferrell, Petree, Stockton, Stockton & Robinson, Winston-Salem, N. C., for defendant, Container Corp. of America.

Robert P. Buford, Jr., and Joseph C. Carter, Jr., of Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., and Charles F. Blanchard, Raleigh, N. C., for defendant, Albemarle Paper Mfg. Co.

W. P. Sandridge and W. F. Womble, of Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., for defendant, Carolina Container Co.

Helmer R. Johnson and Charles E. Lewis, of Willkie, Farr, Gallagher, Wal-

ton & Fitzgibbon, New York City, and W. C. Harris, Jr., of Holding, Harris, Poe & Cheshire, Raleigh, N. C., for defendant, Continental Can Co., Inc.

Howard T. Milman and Robert D. Krumme, of Sullivan & Cromwell, New York City, and Charles T. Hagan, Jr., of Adams, Kleemeier, Hagan & Hannah, Greensboro, N. C., for defendant, Crown Zellerbach Corp.

David J. Mays and John W. Edmonds, III, of Tucker, Mays, Moore & Reed, Richmond, Va., and John W. Hardy, of Douglas, Ravenel, Josey & Hardy, Greensboro, N. C., for defendants, Dixie Container Corp. and Dixie Container Corp. of N. C.

Louis A. Highmark, of Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., and McNeill Smith, of Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for defendant, Inland Container Corp.

Lawrence E. Walsh and Henry L. King, of Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, and Arthur O. Cooke, of Cooke & Cooke, Greensboro, N. C., for defendant, International Paper Co.

Ford W. Ekey and Jon M. Sebaly, of Smith & Schnacke, Dayton, Ohio, and Richard L. Wharton of Wharton, Ivey & Wharton, Greensboro, N. C., for defendant, The Mead Corp.

B. Warwick Davenport and Robert P. Buford of Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., and Charles F. Blanchard, Raleigh, N. C., for defendant, Miller Container Corp.

Fred E. Fuller and James A. Sprunk, of Fuller, Seney, Henry & Hodge, Toledo, Ohio, and Welch Jordan, of Jordan, Wright, Henson & Nichols, Greensboro, N. C., for defendant, Owens-Illinois Glass Co.

Richard A. Whiting and Robert M. Goolrick, of Steptoe & Johnson, Washington, D. C., and Thomas W. Blackwell, Jr., of Blackwell, Blackwell, Canady & Eller, Winston-Salem, N. C., for defendant, St. Joe Paper Co.

Horace R. Lamb and H. Richard Wachtel, of LeBoeuf, Lamb & Leiby, New York City, and Norman Block, of Block, Meyland & Lloyd, Greensboro, N. C., for defendant, St. Regis Paper Co.

James A. Weller, of Epps, Powell, Weller, Taylor & Miller, Johnson City, Tenn., and D. Newton Farnell, Jr., Greensboro, N. C., for defendant, Tri-State Container Corp.

James R. Withrow, Jr., Edward R. Kenney, and Alfred H. Hoddinott, Jr., of Donovan, Leisure, Newton & Irvine, New York City, and L. P. McLendon and Thornton H. Brooks, of McLendon, Brim, Holderness & Brooks, Greensboro, N. C., for defendant, Union Bag-Camp Paper Co.

E. Nobles Lowe and James Dale Thom, New York City, and Armistead W. Sapp, Jr., of Sapp & Sapp, Greensboro, N. C., for defendant, West Virginia Pulp & Paper Co.

Daniel C. Smith, Tacoma, Wash., and Fred B. Helms, of Helms, Mulliss, McMillan & Johnston, Charlotte, N. C., for defendant, Weyerhaeuser Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWIN M. STANLEY, Chief Judge.

The plaintiff, United States of America, seeks by this civil action to prevent and restrain an alleged violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Briefly summarized, the complaint charges that "the defendants have engaged in a combination and conspiracy in unreasonable restraint of * * * interstate trade and commerce in corrugated containers, in the Southeastern United States, in violation of Section 1 of the Sherman Act"; that the "combination and conspiracy has consisted of a continuing agreement, understanding, and concert of action among the defendants to exchange among themselves information respecting prices that they have charged, contracted to charge, or quoted, specific customers, for the purpose and with the effect of restricting price competition among themselves in the sale of corrugated containers"; that for "the purpose of effectuating the

* * * combination and conspiracy the defendants have done those things which * * * they combined and conspired to do"; and that the "combination and conspiracy has had the effect, among others, of unreasonably restricting price competition in the sale of corrugated containers to purchasers located in the Southeastern United States."

Each defendant timely filed answer denying, in all material respects, the allegations of the complaint. Additionally, defenses are raised based on the provisions of a consent decree approved and entered on April 23, 1940, by the United States District Court for the Southern District of New York, in the action entitled "United States of America, Plaintiff, against National Container Association, et al., Defendants" (Civil Action No. 8–318).

The case was tried by the Court without a jury. The commendable cooperation of counsel for the plaintiff and for all of the defendants in streamlining both discovery procedures and the presentation of evidence at the trial, resulted in many of the facts, including documents and other exhibits, being stipulated. Appreciation is again expressed to all counsel for their efforts and accomplishments in this regard.

The Court, after giving due consideration to the pleadings and the evidence, including exhibits and stipulations, the requests and briefs submitted by the parties, and the oral arguments of counsel, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

## FINDINGS OF FACT

### I

### *General Findings*

1. Jurisdiction of the subject matter duly appears, and proper venue of the defendants is not contested.

2. For purposes of brevity, the defendants are referred to herein by the following abbreviated names:

Container Corporation of America ........... Container Corporation
Albemarle Paper Manufacturing Company .... Albemarle
Carolina Container Company ................ Carolina
Continental Can Company, Inc. ............. Continental
Crown Zellerbach Corporation .............. Crown Zellerbach
Dixie Container Corporation ............... Dixie
Dixie Container Corporation of North Caro-
　　lina ................................. Dixie of North Caro-
　　　　　　　　　　　　　　　　　　　　　　　lina
Inland Container Corporation .............. Inland
International Paper Company ............... International
The Mead Corporation ..................... Mead
Miller Container Corporation .............. Miller
Owens-Illinois Glass Company .............. Owens-Illinois
St. Joe Paper Company ..................... St. Joe
St. Regis Paper Company ................... St. Regis
Tri-State Container Corporation ........... Tri-State
Union Bag-Camp Paper Corporation ......... Union-Camp
West Virginia Pulp and Paper Company ...... West Virginia
Weyerhaeuser Company ..................... Weyerhaeuser

———◆———

3. Except as otherwise stated or required by context, the facts herein found occurred or existed within the period from January 1, 1955, to October 14, 1963 (hereinafter referred to as the "period covered by the Complaint"), and within, and are limited to the Southeastern United States (herein defined as the

States of Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Tennessee and Kentucky).

4. Each defendant engaged in the manufacturing and selling of corrugated containers in the regular course of its business, except that the following defendants were not engaged in the corrugated container business in the Southeastern United States prior to the date set forth opposite their respective names:

| | |
|---|---|
| Albemarle | September 9, 1959 |
| Continental | October 26, 1956 |
| Crown Zellerbach | November 30, 1955 |
| Dixie of North Carolina | March 1, 1959 |
| Mead | December 27, 1956 |
| Owens-Illinois | October 4, 1956 |
| St. Regis | October 2, 1958 |
| West Virginia | September 30, 1957 (except through its subsidiary Hinde & Dauch) |
| Weyerhaeuser | May 1, 1957 |

Most of the corrugated containers sold by each of the defendants in the regular course of its business were manufactured by it upon customer order, and in accordance with the specifications prepared by or for the particular customer so ordering, as to the style, dimensions, weight, strength, color, printing, type of joint, and other physical characteristics, and, unless otherwise expressly designated, whenever corrugated containers are referred to herein they are of the character described in this Finding.

6. The basic material used in the manufacture of corrugated containers is corrugated containerboard consisting of one or more sheets of a corrugated material sandwiched between two or more sheets of linerboard.

7. Each defendant, in the regular course of its business, has sold and shipped substantial quantities of corrugated containers to customers located in states other than the states in which said corrugated containers were manufactured.

## II

### The Industry

8. Aggregate dollar sales of corrugated containers for all defendants for each year since, and including, 1961 were in excess of $100 million per year. At the time of the filing of the Complaint herein, the aggregate shipments of corrugated containers of all defendants from plants in the Southeastern United States represented approximately ninety per cent (90%) of total shipments of corrugated containers from all plants in the Southeastern United States.

9. During the period covered by the Complaint, there has been growth and expansion of the corrugated container industry in the Southeastern United States. From an industry comprised in 1955 of 30 manufacturers having a total of 49 corrugated container manufacturing plants, it has grown to an industry comprised in 1963 of 51 manufacturers having a total of 98 such plants. In January of 1955 the beginning of the period covered by the Complaint, 9 of the 18 defendants, and 21 non-defendants, were engaged in the corrugated container business in the Southeastern United States. In 1963, the end of the period covered by the Complaint, there were a total of 18 defendant and 33 non-defendant corrugated container manufacturers in the Southeastern United States. During the same period, shipments of corrugated containers from plants located in the

Southeastern United States increased from slightly over 9 billion square feet in 1955 to almost 16 billion square feet in 1963. The growth and expansion is illustrated by the following statistics showing the number of such plants in the Southeastern United States and the volume of shipments therefrom:

| Year | Total | Number of Plants Defendants | Others | Shipments of Corrugated Containers (Millions of Sq. Ft.) |
|------|-------|------------|--------|----------|
| 1955 | 49 | 18 | 31 | 9,077 |
| 1956 | 56 | 21 | 35 | 9,659 |
| 1957 | 59 | 30 | 29 | 10,026 |
| 1958 | 67 | 36 | 31 | 10,400 |
| 1959 | 71 | 43 | 28 | 12,328 |
| 1960 | 76 | 46 | 30 | 12,266 |
| 1961 | 81 | 53 | 28 | 13,481 |
| 1962 | 85 | 55 | 30 | 14,831 |
| 1963 | 98 | 58 | 40 | 15,846 |

10. In 1963, there were more than 10,000 purchasers of corrugated containers in the Southeastern United States and, in addition, several thousand potential purchasers of such containers. In that year, the defendants employed in the aggregate more than 411 sales personnel to sell their corrugated containers who, in the course of their sales activity in behalf of their respective companies, each business day made on the average 4 or 5 calls each on purchasers or potential purchasers. In October, 1963, the defendants had the following number of sales personnel regularly soliciting corrugated container business in the Southeastern United States:

| Company | Number | Company | Number |
|---------|--------|---------|--------|
| Container Corporation | 57 | Mead | 26 |
| Albemarle | 9 | Miller | 7 |
| Carolina | 15 | Owens-Illinois | 59 |
| Continental | 20 | St. Joe | 12 |
| Crown Zellerbach | 27 | St. Regis | 23 |
| Dixie | 12 | Tri-State | 5 |
| Dixie of North Carolina | 3 | Union-Camp | 36 |
| Inland | 24 | West Virginia | 17 |
| International | 23 | Weyerhaeuser | 36 |

11. Throughout the period covered by the complaint, there has been an ample supply of raw materials available from competitors and from others for manufacturing corrugated containers. Necessary machinery and equipment has been available from numerous suppliers. Initial investment for a corrugated container manufacturing facility is relatively low, approximating as little as $50,000 to $75,000 for a minimum size viable enterprise.

12. The capacity to supply all purchasers of corrugated containers in the Southeastern United States has exceeded in each of the years from 1955 through 1963 the demand of purchasers for such containers.

13. The costs of manufacturing corrugated containers vary from plant to plant, and for each plant manufacturing corrugated containers unit costs vary with the ratio between that plant's production and capacity. Generally, each order which increases a plant's ratio of production to its capacity represents an increasing profit or diminishing loss for it. Each plant attempts to obtain orders to enable it to operate at all times at as favorable a ratio of production to its capacity as possible.

14. The demand for corrugated containers is determined by the volume of sales of the wide variety of disparate products manufactured and sold by the many thousands of purchasers of corrugated containers. Purchasers do not buy corrugated containers except as they need them for shipping their products, and do not build up inventories of such containers. Purchasers of corrugated containers do not enter into long term commitments for their requirements. Purchasing is done generally on a spot or short term basis covering a purchaser's immediate or near term requirements.

15. During the period covered by the Complaint, the trend of corrugated container prices was downward, and while containerboard prices fluctuated during the period they were substantially the same at the end of the period as at the beginning thereof, in contrast to the increase in prices during the same period for paper and allied products generally, and for all other commodities, excluding farm and food. During the same period, labor rates, machinery and equipment costs, and other production costs, for both corrugated containers and containerboard, increased.

### III

*Nature and Extent of Competition;*
*Effect of Price Communication*

16. Throughout the period covered by the Complaint, the corrugated container industry was and is highly competitive, and each defendant engaged in and was faced with price competition in the sale of corrugated containers; and the parties stipulated that if the officers or employees of each defendant responsible for pricing corrugated containers in the Southeastern United States were called to testify, each such officer or employee would so testify.

17. Throughout the period covered by the Complaint, every purchaser of corrugated containers had numerous alternate sources of supply, both actual and potential. Such purchasers were free to shift all or a part of their business from one supplier to another, and they frequently did so. Although such purchasers generally did not make such shifts unless offered a lower price by another supplier, each defendant repeatedly lost customers and obtained new ones, and continuously had substantial losses and gains in its sales to particular customers. Tables 1 and 2 annexed to DX–1, and the Charts on pages 21 through 24 of DX–6, reflect business lost and gained from one year to the next for the period 1960–1962. The figures shown in said Tables and Charts are representative for each defendant of the entire period covered by the Complaint.

18. The following examples from Tables and Charts referred to in the preceding paragraph are typical of the extent of gains and losses in customers and in sales to particular customers experienced by each of the defendants throughout the period covered by the Complaint:

(a) In 1960, Container Corporation's plants in the Southeastern United States made sales of corrugated containers to a total of 3,132 accounts. Of these, 1,209 accounts, representing over 38% of all of the accounts sold by Container Corporation during that year, were new accounts; i. e., accounts which had bought nothing from any of Container Corporation's plants in the Southeastern United States during the preceding year. In addition, Container Corporation's sales during that year to another 488 of those accounts, representing over 15% of the

total, amounted to more than 150% of its preceding year's sales to each of such accounts. Moreover, of the 3,132 accounts sold in 1960 a total of 1,210 (over 38%) were totally lost by Container Corporation in 1961, and its sales in 1961 to another 343 of these accounts (over 19% thereof) were less than 50% of its preceding year's sales to each of such accounts. Not only was a large percentage of Container Corporation's total Southeastern United States accounts involved in such gains and losses but the dollar volume of its sales to such accounts was also very substantial, accounting for over $14,300,000 out of total sales of about $29,400,000, or more than 48% of Container Corporation's total corrugated container sales from plants in the Southeastern United States.

(b) In 1960, Albemarle's plant at Richmond, Virginia, sold a total of 291 accounts. Of these, 92 (over 31%) were new accounts. Albemarle's sales in 1960 to another 49 accounts (over 16% of Albemarle's total accounts) amounted to over 150% of its preceding year's sales to each of such accounts. Of the 219 accounts sold by Albemarle in 1960, 96 (approximately 33%) were totally lost by it in 1961, and its 1961 sales to another 50 of these accounts (over 17%) were less than 50% of its preceding year's sales to each of such accounts. The dollar volume of Albemarle's 1960 sales to the accounts involved in such gains and losses amounted to almost $1,200,000, or more than 67% of its total 1960 corrugated container sales of less than $1,800,000.

(c) In 1960, Owens-Illinois' plants at Atlanta, Georgia, Jacksonville, Florida, Miami, Florida, and Salisbury, North Carolina, sold a total of 2,527 accounts. Of these, 908 (over 35%) were new accounts. Owens-Illinois' 1960 sales to another 381 accounts (over 15% of total 1960 accounts) exceeded 150% of its preceding year's sales to each of such accounts. Of the 2,527 accounts sold in 1960, 941 (over 37%) were lost by Owens-Illinois in 1961, and its 1961 sales to another 268 of these accounts (over 10%) decreased to less than 50% of its 1960 sales to each of such accounts. The dollar volume of Owens-Illinois' 1960 sales to the accounts involved in such gains and losses amounted to almost $8,900,000, or more than 62% of its total 1960 corrugated sales from the above plants of less than $14,300,000.

19. The record includes over 1,000 documents from the defendants' files. These documents are contemporaneous business records, most of which relate to specific purchasers, prepared by employees directly engaged in the sale of corrugated containers. They constitute a sampling from defendants' files, and tend to portray independent and unrestricted price competition by each of the defendants. This sampling relates to hundreds of purchasers of corrugated containers and to thousands of transactions with such purchasers. Among other things, these documents establish that during the period covered by the Complaint:

(a) In order for a supplier or prospective supplier to compete effectively for the business of a purchaser, there is a vital need for information as to the price alternatives available to that purchaser.

(b) Purchasers usually informed suppliers and prospective suppliers as to prices most recently charged or quoted by competing suppliers and identified the particular supplier or suppliers charging or quoting such prices.

(c) Purchasers often informed suppliers and prospective suppliers as to the particular prices which must be met or beat in order to obtain or retain business.

(d) Upon obtaining such price information, suppliers and prospective suppliers often reduced their prices.

(e) Absent such price information, a supplier or prospective supplier often quoted prices higher than those recently charged or quoted by other suppliers.

(f) Each defendant often encountered situations in which the prices most recently charged or quoted by it were cut by other defendants, and responded to such price cutting by meeting or beating the prices quoted by such other defendants.

(g) Each of the defendants endeavored to obtain additional sales by cutting the prices which other defendants had most recently charged or quoted to their customers or prospective customers.

20. Plaintiff was furnished listings showing the name and address of every corrugated container customer in the Southeastern United States of each of the defendants, aggregating more than 10,000 such customers. No evidence was adduced by plaintiff from any of such *customers* showing or in any way indicating that the prices charged by any one or more of the defendants were stabilized or harmonized by the requesting or furnishing of price information by or between any of the defendants, or showing or in any way indicating that the prices charged or quoted such customers were any higher than they would have been had there not been any such requesting or furnishing of price information, or showing or in any way indicating any uniformity or parallelism of prices between or among any two or more of the defendants.

21. The record contains statistics, together with graphical presentations prepared therefrom, showing for the entire period covered by the Complaint the four-week price trend of each plant of each defendant, except Albemarle, Miller and St. Joe, and the average monthly prices of St. Joe. These statistics tend to demonstrate the absence of any general uniformity, harmony, stability, or parallelism in prices either as among the several defendants or among the plants of individual defendants. Most price trends varied widely among the plants of the several defendants, both as to direction and as to degree.

## IV

### How Prices Determined

22. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, each defendant exercises its own business judgment. Many factors influence the decision, including, among others, the following:

(a) estimates prepared from its internal manual;

(b) current plant production load or existence of idle time in its plant, a condition which varies widely in each plant from week to week, season to season, and with the rise and fall of business activity of its customers;

(c) suitability of the equipment in its plant for the production of the particular container and the expense of obtaining new equipment when necessary;

(d) availability of any special materials needed to produce the order;

(e) desirability of adding the particular order to the then scheduled plant production mix and the ability to do so, which varies continuously in the operation of the plant;

(f) convenience of customer's plant location for servicing and cost of delivery;

(g) size of the order, e. g., carload or less than carload shipment, and customer's prescribed delivery schedule;

(h) customer's credit rating;

(i) growth prospects of the account and the possibility of substantial future orders;

(j) the experimental or developmental character of the particular container and the need to gain manufacturing and marketing experience with respect to it;

(k) amount of customer's business represented by the order;

(l) general market conditions in the Southeastern United States and in the

corrugated container industry particularly;

(m) prices of its recent sales of the same or other corrugated containers to that customer;

(n) customer loyalty;

(o) effect of the order on its costs and profits; and

(p) prices believed to have been most recently charged or quoted by competitors, when such defendant believes it has sufficient basis for such belief.

23. A defendant regularly supplying a customer with corrugated containers, when pricing an order from that customer for additional corrugated containers of the same or different specifications, would usually price such additional containers on the same basis used by it in pricing that customer's last previous order. The foregoing was subject to change when (1) there had been a change in any of the competitive or other market factors or conditions; (2) the specifications and volume requirements were not substantially the same; or (3) there had been a change in raw material costs or other significant costs.

24. Most purchasers of corrugated containers generally purchased their containers from two or more of the defendants concurrently.

25. Prices which purchasers of corrugated containers would pay were determined on the basis of price alternatives available to them from existing and prospective suppliers. It was necessary for each supplier to meet or be below competition in order to retain its customers, and to meet or be below the prices and other terms offered by competitors in order to obtain new customers or additional business from existing customers.

26. The defendants, in selling corrugated containers, dealt with buyers who had knowledge of prices which had been and were being offered by competing suppliers of corrugated containers.

27. Before determining the price to be quoted to a specific purchaser for a corrugated container, each defendant was interested in all pertinent marketing information applicable to such account. Among other things, each defendant considered the price which that purchaser had most recently been charged or quoted for corrugated containers to be pertinent marketing information and considered it beneficial to have such information.

28. All corrugated containers made to particular specifications were substantially identical regardless of which manufacturer produced them, and purchasers of corrugated containers were able to and did shift from one supplier to another on the basis of price. With minor exceptions, therefore, no manufacturer of such containers was able to obtain a higher price for such containers than the price at which another manufacturer had sold or offered to sell like containers to such purchaser, and it was important to each manufacturer to have accurate information as to the price alternatives available to such purchaser. Moreover, some purchasers did not accept the offer of the manufacturer making the lowest initial quotation, but afforded other manufacturers an opportunity to meet such lower quotation, and if met, such purchasers often divided their purchases among some or all of the low-quoting manufacturers. In consequence, when a defendant obtained what it considered reliable information as to the most recent price to a specific customer for a specific corrugated container, in the majority of instances it quoted or charged substantially the same price, irrespective of whether the source of its information had been the purchaser or another supplier. In many instances, however, depending upon particular circumstances, each defendant quoted lower or higher prices, and in all instances the determination as to the price to be charged or quoted was its individual decision.

V

*Obtaining Price Information*

29. Possible sources for obtaining the most recent price to a specific customer

for corrugated containers included the defendant's own records of prior sales, the particular purchaser involved, or one of his present or former corrugated container suppliers. Usually such information was obtained from the defendant's own records of prior sales, or from the particular purchaser involved. As used herein, the words "most recent price" mean either the most recent price charged a specific customer in an actual sale or the price most recently quoted.

30. On occasions, buyers furnish suppliers with incomplete, inaccurate, or misleading information as to prices offered by competing suppliers.

31. No defendant furnished any competitor most recent price information except in response to a specific request therefor. However, when such information was furnished, it was usually accurate.

32. The extent and frequency with which most recent price information was requested or furnished varied among the several defendants and among the plants and customers of the individual defendants.

33. There is no evidence of express assurance that any defendant who furnished such price information upon request of another defendant would be able to obtain price information from such other defendant.

34. There is no evidence that any employee of any defendant ever discussed with any employee of any other defendant the desirability of furnishing price information, or the fact that price information had been or was being communicated, or the frequency of such communication, or the requesting or failing to request such information, or the method of communicating, or the action to be taken or not to be taken with respect to any such information.

35. The parties stipulated that if the officers or employees of each defendant responsible for pricing corrugated containers in the Southeastern United States were called to testify, each such officer or employee would testify that he con-sidered that he could (with the exceptions noted in Findings 71, 167, 186 and 261), request from or furnish to competitors or not request from or furnish to competitors information as to prices for corrugated containers, and whether or not to request or furnish such information was an individual decision.

36. There is credible evidence tending to show that, generally speaking, when price information was requested of a defendant by a competitor, such defendant's decision whether or not to furnish such information was not affected by any price or price level which such competitor had previously charged or quoted or which such competitor might thereafter charge or quote.

37. Throughout the period covered by the Complaint, each defendant felt free to cut a most recent price received from a competitor, and after receiving a most recent price from another defendant occasionally charged or quoted prices lower than those received.

38. No defendant at any time had any express agreement or understanding with any other defendant with respect to any price or prices to be charged or quoted for corrugated containers, irrespective of whether or not such defendant had requested from or furnished to the other any price information.

VI

*The 1940 Consent Decree*

39. On April 23, 1940, a consent decree was entered in an action entitled "United States of America, Plaintiff, against National Container Association, et al., Defendants" in the United States District Court for the Southern District of New York (Civil Action No. 8–318).

40. In addition to Container Corporation and Inland, defendants herein, the following corporations were among the defendants in the aforementioned action:

Robert Gair Company, Inc., which was subsequently merged into Continental;

Gaylord Container Corporation, which was subsequently merged into Crown Zellerbach;

The Hinde & Dauch Paper Company, which was subsequently merged into West Virginia;

The Jackson Box Company, which was subsequently merged into Mead;

F. J. Kress Box Company, Niagara Corrugated Container Co., Inc, and Superior Paper Products Co., which were subsequently merged into St. Regis;

National Container Corporation, which was subsequently merged into Owens-Illinois; and

Eddy Paper Corporation and Kieckhefer Container Corporation, which were subsequently merged into Weyerhaeuser.

41. On April 20, 1940, in presenting the consent decree for the approval of the District Court in the above-entitled action, counsel for the Government stated in open court:

"The Government regards this decree as fully complying with the Departmental policy. We think it is a well drafted document, which fully satisfies the Department's policy, in that it presents a constructive program which is designed to insure, not only that the violations complained of will cease, but also that such steps will be taken by the industry as will redound to the general public welfare."

42. A *nolle prosequi* was signed in the companion criminal action (No. C–105–445) on April 23, 1940, and entered April 24, 1940. In its *nolle prosequi,* the Government stated:

"That it is the publicly announced policy of the Department of Justice to recommend that indictments under the Antitrust Laws be nolle prossed in the event that defendants voluntarily submit a program, embodied in a consent decree, which goes beyond anything that might be achieved by successful criminal prosecution and which binds them to a course of conduct deemed to be in the public interest in preventing the causes of illegal restraints of trade and in promoting free competition in an orderly market;

\* \* \* \* \* \*

"3. That the National Container Association and the corporate defendants hereinafter named, and The Stevenson Corporation have agreed to the entry of a consent decree, Civil No. 8–318, which embodies substantially the requirements in such matters set out in Paragraph 1 above;

"4. That such consent decree has been tendered by defendants voluntarily and in good faith;

"5. That in the opinion of the Department of Justice; the nolle prossing of this case as to the defendants hereinafter named is justified pursuant to the policy stated in Paragraph 1 above; \* \* \* "

43. The consent decree was widely publicized, both when it was entered and in the years subsequent thereto, in the corrugated container industry, and each of the defendants in the instant case has been cognizant of the existence of the decree and of the terms thereof and has relied thereon.

44. The consent decree provides, in part, as follows:

"3. Nothing contained in this decree limits the right of said defendants, their successors, members, directors, officers, agents, and employees, and all persons acting under, through, or for them, or any of them, to do, or to cooperate in doing, any act, or to engage in any practice, not enjoined by this decree, including but not limited to the following:

"(a) gathering, auditing, and disseminating information as to the cost of manufacture of corrugated and solid fibre containers, the volume of production and shipment, the actual price (or base price derived from actual price) which the product has brought in past transactions, stocks of merchandise and materials on hand, approximate cost of transportation, and any other facts pertaining to the condition or operation of the industry, and

meeting to discuss such information and statistics without, however, reaching or attempting to reach any agreement or any concerted action with respect to prices or production of such containers; * * *

"4. Nothing contained in this decree limits the right of a defendant to issue and circulate lists of current prices charged for its corrugated or solid fibre containers provided such lists are made available to the trade and competitors."

## VII

### Manuals and Internal Manuals

45. Most of the defendants prepared manuals for their own internal use containing formulae and schedules of costs and/or charges from the application of which their respective approximate manufacturing costs and/or price estimates could be computed for most corrugated containers manufactured by them. Such manuals contained schedules of costs and/or charges for corrugated container-board of various weights, strengths and wall constructions stated in terms of dollars and cents with a successively higher amount being listed for grades of board of successively greater strength. They also contained various costs and/or charges relating to the actual manufacture of corrugated containers. The manuals further contained schedules of costs and/or charges, commonly called set-up charges, for the setting up of the necessary machinery for the production of corrugated containers of various specifications. Various of such manuals have been revised from time to time to reflect changes in costs, products, materials, designs and market conditions. These manuals were variously referred to by the companies which prepared them, among other things, as "cost manuals," "pricing manuals," "pricing procedures" or "estimating manuals." Whenever these manuals are hereinafter referred to, they are specifically described as "internal manuals." Generally, the internal manuals were for internal use, and not available to the other defendants.

46. At various times, manuals containing formulae and schedules of charges, from the application of which a price estimate could be computed for most containers manufactured by them, were prepared by each of the following: National Container Corporation, The Old Dominion Box Company, Inc., Crown Zellerbach (Gaylord Container Division) and Inland. Each of said manuals was made available to other manufacturers of, and customers for, corrugated containers. Except as otherwise stated, as used hereafter the word "manual" means one of the manuals referred to in this Finding.

47. The manuals were variously referred to in the trade, among other things, as "price lists," "estimating and pricing manuals," or "estimating manuals."

48. Each of the manuals contained a schedule of charges for corrugated container board of various weights, strengths and wall constructions for use in computing corrugated container prices according to the particular manual employed. These charges are stated in terms of dollars and cents with a successively higher amount being listed for grades of board of successively greater strength. In the trade, these charges were various called, among other things, an "area charge," "base," "base price," "board base price," "board factor," "multiplier," "level" and "board level."

49. The manuals also contained various charges relating to the actual manufacture of corrugated containers. Before the actual manufacturing process could begin, it was necessary to set up the production machinery to accommodate the particular specification, such as style, dimensions, printing, kind of joint, etc., for each individual order and type of corrugated container. The manuals also contained a schedule of charges commonly called "set-up charges" to cover the cost of the setting up of the necessary machinery for the production of corrugated containers of various specifications.

50. In arriving at the price to be quoted or charged a particular purchaser for particular corrugated containers, each defendant took into account the price currently or most recently charged by it to that purchaser for the same or similar corrugated containers, the price alternatives available to the purchaser, its estimated manufacturing costs, desirability of such business, and the anticipated profit involved. In this connection, each of the defendants has used one or more of the manuals to compute price estimates on a substantial number of occasions in one or more of the following ways:

(a) By application of the formulae and schedules of charges set forth therein;

(b) By application of the formulae and schedules of charges set forth therein, but employing a board level different from that stated therein;

(c) By application of the formulae and schedules of charges set forth therein, but employing a set-up charge different from that stated therein;

(d) By application of the formulae and schedules of charges set forth therein, but employing other charges different from those stated therein;

(e) By any combination of the applications referred to in subparagraphs (b) (c) and (d) hereof; or

(f) By any of the applications hereinabove set forth, but then applying a discount to the result.

The extent of such use varied among the several defendants, and among the plants and customers of individual defendants.

51. In arriving at the price to be quoted or charged a particular purchaser for particular corrugated containers, each defendant having an internal manual or internal manuals used such internal manuals in approximately the same ways and under the circumstances described in Finding 50, and often along with one or more of the manuals referred to in Finding 50. The extent of such use varied among the several defendants, and among the plants and customers of individual defendants.

52. If the same board level and set-up charge were used in computing a "manual" price for a corrugated container of particular specifications there would be, in most instances, little difference in the results of the computation, regardless of which manual was used in making the computation.

53. The actual price charged for corrugated containers was usually referred to in the trade as the "end price," which in most instances was different from any manual price referred to in Finding 52.

54. On those occasions when a defendant furnished to another defendant, upon his request, the most recent price to a specific customer for corrugated containers, such information usually was furnished either in terms of an end price or in terms of a board level. In the case of some defendants, such information was furnished only in terms of an end price.

55. On those occasions when a defendant furnished to another defendant, upon his request, the most recent price to a specific customer for corrugated containers, end prices usually were furnished when the request involved only a few different container items, and board levels usually were furnished when the request involved more than a few different container items.

56. When a customer ordered two or more different corrugated containers, specifying the same test board for all but otherwise involving different specifications, usually the supplier filled said order at prices reflecting for the entire order a constant charge for board.

57. Each defendant having its own "manual" or "internal manual," prepared the same, and any revisions thereof, independently and without any agreement or understanding with any other defendant.

58. Price or cost estimates for a particular corrugated container computed under any one of such internal manuals differed from the price or cost estimates for such container computed under internal manuals of other companies.

59. The great majority of sales of each defendant was made at prices less than the prices would have been if computed on any published manual. There is no regular, prevalent or uniform percentage variation from any such computation in common use among any of the defendants, or in use by any individual defendant. Table 3 annexed to DX–1, and the charts at pages 47 through 68 of DX–6, contain data illustrative of the foregoing for the several defendants for the period covered by the Complaint.

60. When Crown Zellerbach in 1957 prepared and issued its manual as described in Finding 46, it adopted, and for a period of months followed, a policy to adhere to said manual. During that period, no employee had authority to quote or charge prices lower than prices computed on the manual, and as a result Crown Zellerbach lost a great volume of business. It was compelled to abandon that policy to avoid losing all of its business. By cutting prices, it regained the business it lost.

VIII

*The Fibre Box Association*

61. The Fibre Box Association, hereinafter called the "Association," was a trade association with a nationwide membership consisting of manufacturers of corrugated and solid fibre containers. The Association had geographic divisions and zones. Zone 10 comprised the States of Virginia and North Carolina, and was known as the Piedmont Group. Zone 11 comprised the States of South Carolina, Georgia, Florida, Alabama, and those portions of Tennessee and Kentucky east of the Tennessee River with the exception of Boone, Campbell, Jefferson and Kenton Counties of Kentucky, and was known as the Southeastern Group. Each of the defendants except Albemarle, Miller and St. Joe was a member of the Zone 10, Piedmont Group, and/or the Zone 11, Southeastern Group.

62. The Association employed a statistician who supervised its statistical program as a part of which each member compiled and submitted to the As-sociation a weekly summary showing, in square feet, the quantity of corrugated and solid fibre shipments and the dollar value of these shipments. From this data, the Association prepared an overall corrugated price trend which was obtained by dividing the total dollars of sales made to the trade by the total footage shipped. These overall corrugated box price trends were compiled and published monthly for each division.

63. An analyzed price trend was also prepared by taking the reported sales of a selected variety of the more standard containers and adjusting the same for the box size and size of run to a common basis. These trend figures were computed for every member of the zones and divisions as well as for each respective zone and division as a unit. These divisions and zone price trends, as well as aggregate shipment figures for each member, were issued to each member approximately ten days after the close of each week, and included comparative price trend figures for the prior 4-week periods, months, quarters and years. However, the individual member price trend figure was given only to that member. Due to the variety of the materials used and the great variety in construction of the containers, as well as differences in the "mix" due to seasonal factors, the indexes showed only price trends and could not be used for price comparison between competitors nor to ascertain the prices charged for any particular type of containers sold.

64. Meetings of members of Zones 10 and 11 were ordinarily held every four weeks with a representative of the Association and Legal Counsel, and at these meetings there was a review of statistics and charts showing substantially the same information referred to in Findings 62 and 63. In addition, statistics showing the production of paperboard, containerboard and boxboard were reviewed and compared with an average and with the prior year; and total raw material inventory figures were reported. A discussion of current business conditions for the corrugated container industry was

usually included on the program agenda, and a discussion of current and expected demand for corrugated containers as indicated by incoming orders was often a part of the meeting.

65. Individual customer prices were not discussed at Association meetings. On some occasions, before or after said meetings, representatives of some of the defendants attending the meetings furnished most recent price information when requested by a representative of another defendant.

66. On most occasions during this period, the regular four-week Association meetings of the Piedmont Group and the Southeastern Group were held jointly.

IX

*Findings as to Container Corporation*

67. In the trade, Container Corporation, after November 15, 1960, was sometimes known as "Mengel," but only for its Memphis, Tennessee, Nashville, Tennessee, Chattanooga, Tennessee, Lexington, Kentucky, and Winston-Salem, North Carolina, locations. Container Corporation acquired a stock interest in Mengel Company in 1954 and continued to increase its holdings of Mengel common stock, owning approximately 69% by December 1955, and approximately 97% by December of 1959. All of Mengel's preferred stock was retired in April 1956. On November 15, 1960, Mengel Company was merged into Container Corporation.

68. Container Corporation, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

69. On those occasions when, prior to January 1963, Container Corporation considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

70. Prior to January 1963, when Container Corporation received a request from another defendant for the most recent price to a specific customer for corrugated containers, Container Corporation usually furnished the information requested.

71. Since January 1963, it has been Container Corporation's policy that its personnel shall not request or furnish price information from or to other manufacturers of corrugated containers. Prior to 1961, Container Corporation permitted its plant sales managers and general managers in the Southeastern United States to request or furnish the most recent price to a specific customer for corrugated containers from or to other manufacturers of corrugated containers. Beginning in 1961, and continuing until January 1963, it was Container Corporation's policy that only its Southeastern Divisional Manager was permitted to request or furnish the most recent price to a specific customer for corrugated containers from or to other manufacturers of corrugated containers.

72. The extent and frequency with which such information was requested and furnished varied among Container Corporation and the several other defendants and among the plants and customers of Container Corporation.

73. In the circumstances set forth in Findings 69 and 70, Container Corporation requested and/or furnished price information from and/or to each of the other defendants.

74. From time to time between 1958 and 1961, A. S. Clay, Sales Manager for the Winston-Salem Plant of Container Corporation, requested and furnished said price information. From time to time between 1955 and 1958, G. W. Colvin, when he was general manager of the Winston-Salem Plant of Container Corporation, and from time to time between 1961 and January 1963, when he was Southeastern Divisional Manager of Container Corporation, requested and furnished said price information.

75. As a general rule, pricing decisions were made by Container Corpora-

tion at the plant level, and the plant sales manager was primarily responsible for making price determinations. During the period between 1961 and January 1963, G. W. Colvin, Southeastern Divisional Manager, always communicated the price information he had received to the sales manager of the specific plant and generally did not communicate any advice or instructions concerning the price to be charged by the sales manager, nor was he necessarily consulted by the sales manager concerning the price to be charged.

76. Container Corporation requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by Container Corporation from other defendants was taken into account and utilized by such company in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

77. Generally, it was the policy of G. W. Colvin, while Vice-President and Southeastern Divisional Manager for Container Corporation, not to cut a price that had been given to him. However, he testified that he knew of no such Container Corporation policy and that there were instances when Container Corporation had cut prices after obtaining price information from competitors, and he knew that there were some occasions when Container Corporation had its prices cut by competitors after giving price information to them. A. S. Clay had no rule, general practice, personal principle, or personal policy concerning the prices to be charged or quoted after he had received price information from competitors, and in each instance, he made the price determination himself.

78. When a Container Corporation plant sales manager requested and received price information as described in Finding 69, the sales manager used the information along with Container Corporation's internal manual, which was a cost rather than a sales price manual, as well as his other market information, to help him determine whether he was interested in obtaining the business, and what price he would charge or quote that customer. The plant sales manager had no set policy with regard to submitting a quotation to a customer at a price lower than that which he had learned from a competitor. In determining his prices, each sales manager attempted to get as much as he could within reason. The sales manager felt no obligation with regard to a competitor who had furnished price information to him, nor was such obligation ever expressed to the sales manager by such a competitor.

79. In all instances, the determination as to the price to be charged or quoted by Container Corporation was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Container Corporation exercised its own business judgment.

80. As earlier stated, Container Corporation stopped requesting or furnishing price information in January 1963. A study of Container Corporation's analyzed prices at its plants shows that in the nine-month period from January to October 1963, average analyzed prices were substantially the same as the average analyzed prices at its plants in the nine-month period immediately preceding January 1963. Moreover, the range between the highest and lowest prices in each of its plants in the nine-month period before January 1963 was approximately the same as the range in those plants in the nine-month period from January to October 1963.

81. Container Corporation's price trends differed from those of each of its competitors, and there is no parallel between them.

82. Container Corporation's price trends also varied from plant to plant, as

shown by comparing the price trends of its plants for the years 1955 to 1963.

83. Container Corporation's prices also varied from month to month throughout the period covered by the Complaint.

## X

### *Findings as to Albemarle*

84. Albemarle, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, except St. Regis, although not necessarily at all times or in all areas or for all purchasers.

85. On those occasions when Albemarle considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

86. When Albemarle received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished, it was accurate.

87. The extent and frequency with which such information was requested or furnished varied among Albemarle and the several other defendants.

88. In the circumstances set forth in Findings 85 through 87, Albemarle requested and/or furnished price information from and/or to each of the other defendants, except Dixie of North Carolina, International, St. Joe and St. Regis.

89. The price information furnished by Albemarle related to prices charged customers in actual sales or prices actually quoted to customers.

90. From time to time, Anthony J. Bagley, President of Richmond Container from 1957 to September 9, 1959, and Division Manager of Albemarle after such date, and M. F. Dozier, Sales Manager of Richmond Container to September 9, 1959, and Division Sales Manager of Albemarle after such date, on occasion requested and furnished said price information.

91. Albemarle requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by Albemarle from other defendants was taken into account and utilized by such company in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

92. In all instances, the determination as to the price to be charged or quoted by Albemarle was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Albemarle exercised its own business judgment.

93. Albemarle's price trends differed from those of each of its competitors, and there is no parallel between them.

## XI

### *Findings as to Carolina*

94. Carolina, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, except St. Joe, although not necessarily at all times or in all areas or for all purchasers.

95. On those occasions when Carolina considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

96. When Carolina received a request from another defendant for the most re-

cent price to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished it was accurate.

97. The extent and frequency with which such information was requested or furnished varied among Carolina and the several other defendants and among the customers of Carolina.

98. In the circumstances set forth in Findings 95 through 97, Carolina requested and/or furnished price information from and/or to each of the other defendants, except St. Joe.

99. There is no evidence that the price information furnished by Carolina related to prices quoted upon which an actual order had not at that time been received from the customer.

100. Carolina furnished price information only in response to a competitor's request, and was supplied such information only pursuant to its own specific request.

101. From time to time, C. T. Ingram, Vice-President and General Manager of Carolina, and Carter Holbrook, Sales Manager of Carolina, on occasion requested and furnished said price information.

102. Carolina requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by Carolina from other defendants was taken into account and utilized by Carolina in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

103. In all instances the determination as to the price to be charged or quoted by Carolina was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the

price to be charged or quoted, Carolina exercised its own business judgment.

104. Carolina's price trends differed from those of each of its competitors, and there is no parallel between them.

105. Carolina's prices also varied from month to month throughout the period covered by the Complaint.

## XII

### Findings as to Continental

106. After October 26, 1956, Continental, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

107. On those occasions after October 26, 1956, when Continental considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers. When Continental received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished. Continental neither gave to nor received from St. Joe any price information.

108. The extent and frequency with which such information was requested or furnished varied among the plants and customers of Continental.

109. From time to time between October 26, 1956, and January 1, 1957, and between January 1960 and March 31, 1963, Robert Groner, Jr., as one of Continental's Sales Managers; and from and after January 1, 1962, Jehan B. Johnson, as one of Continental's Sales Managers; and between October 26, 1956, and May 15, 1962, William B. Beams, as one of Continental's Sales Managers, requested and furnished price information, as described in Finding 107.

110. Continental requested price information from other defendants in order

to aid it in making informed pricing and marketing decisions. Price information received by Continental from other defendants was taken into account and utilized by Continental in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

111. When Continental furnished or requested such price information, it furnished such information only in response to a competitor's request, and was supplied such information only pursuant to its own specific request.

112. In all instances, the determination as to the price to be charged or quoted by Continental was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged, or quoted, Continental exercised its own business judgment.

113. Continental's price trends differed from those of each of its competitors, and there is no parallel between them.

114. Continental's price trends also varied from plant to plant, as shown by comparing the price trends of its plants from the date it entered the corrugated container business to the date of the Complaint.

115. Continental's prices also varied from month to month throughout the period it was in the corrugated container business.

## XIII

### Findings as to Crown Zellerbach

116. Crown Zellerbach, in seeking business from the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

117. On those occasions when Crown Zellerbach considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

118. When Crown Zellerbach received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished.

119. The extent and frequency with which such information was requested or furnished varied among Crown Zellerbach and the several other defendants, and among the plants and customers of Crown Zellerbach.

120. In the circumstances set forth in Findings 117 through 119, Crown Zellerbach requested and/or furnished price information from and/or to each of the other defendants.

121. The price information furnished by Crown Zellerbach related to prices charged customers in actual sales or to prices quoted upon which an actual order had not at that time been received from the customer, but only after such a quotation was in the hands of the customer.

122. From time to time, from and after November 1958, Gordon M. Clark, for a part of said time Sales Manager and later Resident Manager of the Greenville, South Carolina, plant of Crown Zellerbach, requested and furnished said price information.

123. Crown Zellerbach requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by Crown Zellerbach from other defendants was taken into account and utilized by Crown Zellerbach in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

124. When Crown Zellerbach furnished price information to other defendants, it gave Crown Zellerbach an insight as to who was actively competing for a particular piece of business.

125. In all instances, the determination as to the price to be charged or quoted by Crown Zellerbach was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Crown Zellerbach exercised its own business judgment.

126. Crown Zellerbach's price trends differed from those of each of its competitors, and there is no parallel between them.

127. Crown Zellerbach's prices varied from month to month throughout the period covered by the Complaint.

XIV

*Findings as to Dixie and Dixie of North Carolina*

128. Dixie and its subsidiary, Dixie of North Carolina, are engaged solely in the box business. They are not part of an integrated company which is also engaged in the paper mill business. The only other non-integrated defendants are Carolina and Tri-State. As an independent box maker, which had already paid a profit on the paper, and had to make its profit, if any, out of the box, it was particularly sensitive to price fluctuations which characterized the industry.

129. Dixie, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, except Dixie of North Carolina, St. Joe and St. Regis, although not necessarily at all times or in all areas or for all purchasers. Dixie of North Carolina was not in competition with Albemarle, Crown Zellerbach, Inland, Miller, Dixie, St. Joe or St. Regis. It was in competition, in seeking business for the sale of corrugated containers, with each of the other ten defendants, although not necessarily at all times or in all areas or for all purchasers.

130. On those occasions when Dixie or Dixie of North Carolina considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

131. When Dixie or Dixie of North Carolina received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished it was accurate.

132. The extent and frequency with which such information was requested or furnished varied among Dixie and the several other defendants, and among Dixie of North Carolina and the several other defendants. During differing intervals of time, Dixie did not request from or furnish such information to certain competitors.

133. H. L. Mitchell, Jr., was President of Dixie and Dixie of North Carolina. One of his purposes in seeking such information was to verify the accuracy of information secured from customers by salesmen of Dixie.

134. Mitchell found that some of the information furnished by competitors upon request was inaccurate.

135. The price information furnished by Dixie in most instances related to a price charged a customer in an actual sale. On occasion Dixie furnished information as to prices quoted upon which an actual order had not at that time been received from the customer. The price information requested and/or furnished by Dixie of North Carolina was "the last price he [the competitor of Dixie of North Carolina] got for the item or order."

136. In the circumstances set forth in Findings 130 and 131, Dixie and Dixie of North Carolina requested and/or furnished price information from and/or to

each of the other defendants with which it competed.

137. From time to time, Mitchell, President of defendant Dixie, requested and/or furnished said price information.

138. From time to time, Joseph S. Schwind, Sales Manager for Dixie of North Carolina, requested and/or furnished said price information.

139. Mitchell gave competitors the most recent price to a specific customer with the hope that the competitor would not cut any more than necessary to get the business.

140. Mitchell had a policy of not calling the competition if he was going to cut a price; his experience was that some competitors would immediately reduce a price after answering an inquiry from Mitchell.

141. Dixie and Dixie of North Carolina requested price information from other defendants in order to aid them in making informed pricing and marketing decisions. Price information received by them from other defendants was taken into account and utilized by each of them in individually determining the prices to be charged or quoted by them in the same manner, to the same extent, and with the same effect as price information which they usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

142. In all instances, the determination as to the price to be charged or quoted by Dixie or Dixie of North Carolina was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Dixie and Dixie of North Carolina exercised their own business judgment.

143. Dixie's price trends and Dixie of North Carolina's price trends differed from those of each of their competitors, and there is no parallel between them.

144. Dixie's prices and Dixie of North Carolina's prices also varied from month to month throughout the period covered by the Complaint.

## XV

### Findings as to Inland

145. Inland, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

146. On those occasions when Inland considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

147. When Inland received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished it was accurate.

148. The extent and frequency with which such information was requested or furnished varied among Inland and the several other defendants, and among the plants and customers of Inland.

149. In the circumstances set forth in Findings 146 through 148, Inland requested and/or furnished price information from and/or to each of the other defendants.

150. From time to time, during the period covered by the Complaint, Frank M. Talbot, Southern Region Sales Manager for Inland, and Barnell E. Roberts, Sales Manager of Inland's Macon, Georgia, plant, requested and furnished said price information.

151. In a written statement issued under date of July 14, 1961, Inland's policy with respect to requesting and furnishing price information from and to other manufacturers of corrugated containers was set forth. It was binding upon all of its Sales Managers, including the said Barnell E. Roberts and Frank

Talbot. Such policy was unilaterally and independently adopted by Inland. Such policy, and the deposition testimony of said Roberts and Talbot, establish that:

(a) Inland's purpose in the requesting and furnishing of price information was to enable it to be better informed in making price determinations.

(b) Its policy in this regard was in reliance upon, and believed by Inland to have been contemplated by, the aforementioned consent decree.

(c) Inland's policy was to request price information from another manufacturer if needed to make an intelligent price decision, and if such information was not obtainable from some other source. Such information was received usually and ordinarily from the purchaser. In some cases, such information was sought to verify a claim of a purchaser (who was attempting to have Inland reduce its price) that another supplier had reduced its price, in circumstances in which the salesmen doubted the reliability of such claim.

(d) Price information so received from another manufacturer was taken into account by Inland's Sales Managers in the same manner and with the same effect as like information usually and ordinarily received from the purchasers, provided the price information received from purchasers was considered reliable.

(e) In a situation in which Inland had a contract with a customer, who was then also being supplied by other manufacturers and during a period when prices had been low for years, and the customer reported that another supplier in the account had reduced its prices, which report the Sales Manager believed doubtful, such Sales Manager would attempt to verify such report with such other supplier because he did not desire to reduce Inland's prices any lower than in fact the prices had been lowered as represented by the customer.

(f) Said policy authorized Inland's Sales Managers to furnish price information requested by other manufacturers within the limits prescribed for requesting such information. Whether to furnish such information upon request was a matter of individual decision by the Sales Managers. It was believed by them that it served Inland's self-interest to furnish such information upon request because they believed that they could not obtain price information from another manufacturer unless they usually furnished price information when requested.

(g) Said policy and Inland's practice thereunder was to request and furnish only the price of the most recent past sale.

152. When Inland furnished or requested such price information, it furnished such information only in response to a competitor's request, and was supplied such information only pursuant to its own specific request.

153. In all instances, the determination as to the price to be charged or quoted by Inland was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Inland exercised its own business judgment.

154. Inland's price trends differed from those of each of its competitors, and there is no parallel between them.

XVI

*Findings as to International*

155. International, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

156. Two employees of International were called by plaintiff to testify on deposition, Edward Agar, from 1948–1957 manager of International's Container Division plant in Spring Hill, Louisiana, and since 1957 manager for the Southern

Region of the Company's Container Division, and Hugh L. Reid, for the past 16 years general manager of International's Container Division plant at Georgetown, South Carolina.

157. During the period 1955 to 1963, at times purchasing agents attempted to persuade International to lower its prices by advising International's sales representatives that its prices were too high when compared with those of other suppliers, and offered International the chance to meet a lower price in order to obtain or retain the business. Sometimes the purchasing agent identified the other supplier and price. Sometimes the price information supplied by the purchasing agent was incomplete, inaccurate, or misleading. On occasion, in the period prior to about June 1962, International made telephone calls to other suppliers to verify the information as to past prices charged which had been supplied by the purchasing agent.

158. Communication of price information by International to other suppliers of corrugated containers occurred without any pattern or regularity, and varied from period to period. Frequency ranged from about 10 or 12 calls a month to about 2 or 3 calls a month, including those made as well as received, with many days without any calls, and on some occasions 2 or 3 a day.

159. International had 23 salesmen in the Southeast making an average of 4 to 5 calls daily on customers and potential customers. In other words, International's salesmen in soliciting business made on the average 92 to 100 calls a day, or 1800 to 2000 calls a month, on purchasers of corrugated containers who bought on a spot or short-term basis covering immediate or near-term requirements. In 1962, International had 449 customers in the Southeast out of more than 10,000 potential customers.

160. Agar had broad administrative responsibilities for a number of plants, including administration, production, sales and personnel, and did not have any direct pricing responsibility. Accordingly, he had no files showing International's prices, and on the infrequent occasions when he was asked for such information by a competitor he obtained it from the plant manager. While Reid had sole pricing authority for the Georgetown plant, and had files showing past prices charged by International, he had many other duties in operating the plant and spent only a minor portion of his time in determining prices.

161. In the circumstances set forth in Findings 157 through 160, and in Findings 162 through 169, International requested and/or furnished price information from and/or to each of the other defendants, except Albemarle and St. Joe. One of International's employees, Reid, testified that he was not sure he had ever, in the eight-year period in question, communicated price information to five of the defendants, and the other International employee, Agar, testified that he did not know four of the 17 other defendants. As to the eight of the defendants about which he was questioned, he could not recall any incident when he gave or received any price information from them.

162. On those occasions when, prior to June 1962, International considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

163. International requested price information on past transactions from another supplier at times when International had been invited by a customer to meet the price of such other supplier.

164. When offered the opportunity by a customer to meet the price of another supplier, International sought information as to past prices .charged by such other supplier to verify the customer's information about such supplier's price in those instances where International wanted to make certain it was a real price and the circumstances justified In-

ternational making an effort to obtain the business of the customer.

165. Prior to June 1962, when International received a request from another defendant for the most recent price to a specific customer for corrugated containers, International usually furnished the information requested.

166. In responding to specific requests for price information on past transactions by other suppliers of corrugated containers, International furnished only end prices for the particular corrugated box as to which inquiry was made.

167. In June 1962, International decided that it would no longer furnish price information to, or request such information from, other suppliers of corrugated containers. While no formal announcement was made of such decision, those who called requesting information were informed that such information would not be furnished.

168. During the time when International furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

169. International requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. The price information received by International from other defendants was taken into account and utilized by International in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as the similar price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

170. There is no evidence that any employee of any.defendant ever discussed with any employee of International the desirability of furnishing price information, or the fact that price information had been or was being communicated, or the frequency of such communication, or the requesting or failing to request such information, or the method of communicating, or the action to be taken or not to be taken with respect to any such information.

171. As one of the factors in computing a price to offer or charge a customer, International on all occasions used its own internal estimating manual. International's manual was prepared and revised independently by it without any agreement or understanding with any other defendant. International did not give its manual to any competitor or customer but retained it for its own use. International did not discuss its manual, or its preparation or revision, with any competitor.

172. International had no manuals of its competitors, except those of National Container Company and Gaylord Container Corporation, which had been obtained from customers of International. On infrequent occasions, in the period about 1958–1960, with respect to accounts which were then being sold by Gaylord, reference was made to the Gaylord manual as an added aid with other factors in helping the plant manager make up his mind as to the price he would quote the customer. If in those accounts the price of a particular container was less when computed on the Gaylord manual than on International's internal manual, and this was business which Reid desired to retain or obtain based on many other factors as to the desirability of the business, he would take into consideration the price developed from the Gaylord manual. In a period sometime before 1958, the National Container manual was referred to by Reid in the same way in competing for business on accounts which were being supplied by National Container Corporation, although with less frequency.

173. There was no relationship in the prices developed on International's internal manual and on Gaylord's manual. With respect to some containers, International's manual would develop a higher price; with respect to others, it would develop a lower price.

174. In all instances, the determination as to the price to be charged or quoted by International was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, International exercised its own business judgment.

175. International increased its capacity to compete by opening new plants in other market areas in the Southeast. In 1957, a new plant was opened in Auburndale, Florida, and in 1962, a new plant was opened in Statesville, North Carolina.

176. During the period 1955 to 1963, the trend of International's prices was downward, while at the same time costs had increased. International continually instructed its employees to attempt to improve earnings by obtaining the highest possible prices for corrugated containers.

177. International lost customers to, and gained customers from, other suppliers of corrugated containers on the basis of price. In 1960, out of 408 separate accounts in the Georgetown and Auburndale plants, 162 accounts, or almost 40%, were totally new accounts gained by these plants, while 64 accounts represented customers lost. Of the 408 accounts in 1960, 110 represented customers where in each case International's sales either rose to more than 150%, or declined to less than 50%, of the preceding year's sales to that customer. Thus in 1960, a total of 336 out of 408 accounts were involved in shifts of business to or from International, either totally or substantially (i. e., one-half or more). In 1961, out of 447 separate accounts at these same plants, 135 accounts, or 30%, were totally new accounts; 96 were lost. Of the 447 accounts in 1961, 143 represented customers where in each case International's sales either rose to more than 150%, or declined to less than 50%, of the preceding year's sales to that customer. Thus, in 1961, a total of 384 out of 447 accounts were involved in shifts of business to or from International, either totally or substantially (i. e., one-half or more.) In 1962, out of 449 separate accounts at those plants, 116 accounts, or 28%, were totally new accounts; at the same time more than 28% of the accounts, or 114, were lost. Of the 449 accounts in 1962, 184 represented customers where in each case International's sales either rose to more than 150%, or declined to less than 50%, of the preceding year's sales to that customer. Thus in 1962, a total of 414 out of 449 accounts were involved in shifts of business to or from International, either totally or substantially (i. e., one-half or more). These figures are representative of the entire period covered by the Complaint.

178. International's price trends differed from those of each of its competitors, and there is no parallel between them.

179. International's price trends also varied from plant to plant, as shown by comparing the Georgetown and Auburndale plants' price trends for 1961 and for 1955–1963.

180. International's prices also varied from month to month throughout the period covered by the Complaint.

181. As earlier stated, International stopped requesting or furnishing price information in June 1962. A study of International's analyzed prices at its Auburndale, Florida, and Georgetown, South Carolina, plants shows that in the twelve-month period after June 1962, average analyzed prices were substantially the same as the average analyzed prices for those plants in the twelve-month period immediately preceding June 1962. Moreover, the range between the highest and lowest prices in the Georgetown and Auburndale plants in the year before June 1962, was approximately the same as the range in those plants in the year following June 1962.

XVII

*Findings as to Mead*

182. Mead, in seeking business for the sale of corrugated containers, was in

competition with each of the other defendants, although not at all times or in all areas or for all purchasers.

183. On those occasions when prior to 1961, and thereafter under the circumstances set forth in Findings 186 and 187:

(a) When Mead considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

(b) When Mead received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished.

(c) During the time when Mead furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

184. The extent and frequency with which such information was requested or furnished varied among Mead and the several other defendants, and among the plants and customers of Mead.

185. The price information which Mead requested and/or furnished, as described in Findings 183 and 184, was requested and/or furnished from and/or to each of the other defendants, and related to prices charged customers in actual sales or to prices quoted upon which an actual order had not at that time been received from the customer.

186. In June 1961, Mead issued a written directive to all of its personnel, one of the effects of which was to prohibit its personnel from requesting or furnishing price information from or to other manufacturers of corrugated containers. In the fall of 1961, the Containers Division of Mead, at the request of its Southeastern Regional Sales Mana-

ger, Virgil C. Shutze, temporarily relaxed the aforesaid prohibition against requesting and furnishing price information from and to other manufacturers of corrugated containers, to a limited extent as to him personally. Thereafter, said Virgil C. Shutze relaxed said prohibition to some extent to District Sales Managers under his supervision. Said Virgil C. Shutze, as Southeastern Regional Sales Manager for Mead's Containers Division, had jurisdiction over Florida, Georgia and Tennessee. During the period of the aforesaid relaxation of the prohibition against requesting and furnishing price information from or to other manufacturers of corrugated containers, District Sales Managers of Mead's Containers Division, Southeastern Region, requested and furnished the most recent price to a specific customer for corrugated containers from or to other defendants in the circumstances herein described. In the spring of 1962, Mead called its Southeastern Regional Sales Manager and the District Sales Managers of Mead's Containers Division to Mead's head office in Dayton, Ohio, at which Mead's policy was reiterated by Mead's principal executive officers and those present were told that no exceptions would be countenanced. This has been Mead's policy since the spring of 1962.

187. In the fall of 1961, Mead attempted to accomplish a general increase in its corrugated container prices. Several competitors also attempted to raise their prices at about the same time. Customers were not a dependable source of information as to the prices offered by competing suppliers. Without accurate market price information, when a customer stated that other corrugated box manufacturers had not increased their prices, Mead's sales personnel could either increase Mead's price as instructed and take the chance of losing the account, or keep the price at a level which the customer claimed he was getting from other suppliers and be sure to keep the account. Mead continued to lose position with its customers and it got to

be an untenable situation. Mead thereafter temporarily relaxed, to a limited extent, as described in Finding 186, its previous prohibition against requesting and furnishing price information from or to competitors, in order to permit Mead employees to seek information as to market price levels in accounts for which Mead was competing.

188. A study of Mead's analyzed prices at its Atlanta, Georgia, Durham, North Carolina, and Miami, Florida, plants shows that in the twelve-month period after April, 1962, average analyzed prices were substantially the same as the average analyzed prices for those plants in the twelve-month period immediately preceding June, 1961.

189. On those occasions when Mead did seek and receive price information from another defendant:

(a) Mead sought such price information only when no other source of such information was available, or when it had obtained recent price information from the purchaser and desired to ascertain the accuracy of such information.

(b) Mead requested such price information for the aforesaid reasons in order to aid it in making informed pricing and marketing decisions. The price information received by Mead from other defendants was taken into account and utilized by Mead in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect, as the similar price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

(c) Many factors influenced Mead's decision in making a price determination, and in making such a decision, Mead exercised its own business judgment. A price believed to have been most recently charged or quoted by a competitor, when Mead believed it had sufficient basis for such belief, was only one of many factors influencing Mead's pricing decision.

(d) In many instances, depending upon particular circumstances, Mead would quote lower or higher prices than that indicated by its information as to the most recent price charged the customer, from whatever source the information was obtained; and in all instances the determination as to the price to be charged or quoted was Mead's individual decision.

190. On those occasions prior to 1961, and thereafter, under the circumstances set forth in Findings 186 and 187, when competitors requested price information, Mead usually furnished price information to that competitor, and hoped that doing so would prompt that competitor to furnish price information to Mead on those subsequent occasions when Mead considered it necessary to request price information.

191. During the time when Mead furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

192. Mead's price trends differed from those of each of its competitors, and there is no parallel between them.

193. Mead's price trends also varied from plant to plant, as shown by comparing the price trends of its plants for 1955–1963.

194. Mead's prices also varied from month to month throughout the period covered by the Complaint.

195. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Mead exercised its own business judgment.

## XVIII

### *Findings as to Miller*

196. Miller, in seeking business for the sale of corrugated containers, was in competition with each of the other de-

fendants, although not necessarily at all times or in all areas or for all purchasers.

197. On those occasions when Miller considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

198. When Miller received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished it was accurate.

199. The extent and frequency with which such information was requested or furnished varied among Miller and the several other defendants.

200. In the circumstances set forth in Findings 197 through 199, Miller requested and/or furnished price information from and/or to each of the other defendants, except St. Joe and St. Regis.

201. From time to time, Harold P. Kyle, as President of Miller, and William M. Noftsinger, as Vice-President and Sales Manager of Miller, gave and received said price information.

202. Miller requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by Miller from other defendants was taken into account and utilized by Miller in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

203. When Miller furnished another defendant, upon request, the most recent price charged to a specific customer for corrugated containers, it did so believing that it was unlikely that it could obtain price information from such other defendant, on those occasions when it considered it necessary to request such information, unless it usually furnished price information when requested by such other defendant.

204. When Miller furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

205. In all instances, the determination as to the price to be charged or quoted by Miller was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Miller exercised its own business judgment.

206. Miller's price trends differed from those of each of its competitors, and there is no parallel between them.

## XIX

### Findings as to Owens-Illinois

207. Owens-Illinois, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

208. On those occasions when Owens-Illinois considered it necessary to ascertain the accuracy of a customer's report of another defendant's price or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

209. When Owens-Illinois received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished it was accurate.

210. The extent and frequency with which such information was requested or

furnished varied among Owens-Illinois and the several other defendants and among the plants and customers of Owens-Illinois.

211. In the circumstances set forth in Findings 208 through 210, Owens-Illinois requested and/or furnished price information from and/or to each of the other defendants.

212. There is no evidence that the price information furnished by Owens-Illinois related to prices quoted upon which an actual order had not at that time been received from the customer.

213. From time to time, from and after October, 1961, Thomas M. Cox, Jr., General Manager of the Southeastern Region of the Forest Products Division of Owens-Illinois, and from time to time, from and after the Spring of 1958, Kenneth E. Rosenbaum, for part of said time Sales Manager and later General Manager of the Salisbury, North Carolina, plant of Owens-Illinois, on occasion requested and furnished price information.

214. Owens-Illinois requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by Owens-Illinois from other defendants was taken into account and utilized by Owens-Illinois in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

215. When Owens-Illinois furnished another defendant, upon request, the most recent price charged to a specific customer for corrugated containers, it did so believing that it was unlikely that it could obtain price information from such other defendant, on those occasions when it considered it necessary to request such information, unless it usually furnished price information when requested by such other defendant.

216. When Owens-Illinois furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

217. In all instances, the determination as to the price to be charged or quoted by Owens-Illinois was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Owens-Illinois exercised its own business judgment.

218. Owens-Illinois' price trends differed from those of each of its competitors, and there is no parallel between them.

219. Owens-Illinois' price trends also varied from plant to plant, as shown by comparing the price trends of its plants for 1955–1963.

220. Owens-Illinois' prices also varied from month to month throughout the period covered by the Complaint.

## XX

### Findings as to St. Joe

221. St. Joe, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, except Dixie, Dixie of North Carolina, and Miller, although not necessarily at all times or in all areas or for all purchasers.

222. On those occasions when St. Joe considered it necessary to ascertain the accuracy of a customer's report of a price charged by another defendant, or to ascertain from another defendant the most recent price charged to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

223. When St. Joe received a request from another defendant for the most recent price charged to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished it was accurate.

224. St. Joe requested or furnished price information from or to other defendants infrequently.

225. In the circumstances set forth in Findings 222 through 224, St. Joe requested and/or furnished price information from and/or to Container Corporation, Crown Zellerbach, Inland, Mead, Owens-Illinois, St. Regis, West Virginia, and Weyerhaeuser.

226. St. Joe neither furnished nor requested any price information, except a price charged the customer in an actual sale. No representative of St. Joe at any time requested from or furnished to any other defendant information as to prices in terms other than an end price or prices.

227. When St. Joe requested or furnished price information, it was done exclusively by telephone.

228. St. Joe would request price information from another defendant only after St. Joe had analyzed the business and determined that it was desirable from the standpoint of type of linerboard required, contribution to plant product mix, customer's credit standing, and other relevant factors. St. Joe then would not request price information from another defendant unless it did not have enough information itself to determine a price, had not received price information from a customer, and did not have its own past price record for that customer.

229. St. Joe requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by St. Joe from other defendants was taken into account and utilized by it in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

230. When St. Joe furnished another defendant, upon request, the most recent price charged to a specific customer, it did so believing that it was unlikely that it could obtain price information from such other defendant, on those occasions when it considered it necessary to request such information, unless it usually furnished price information when requested by such other defendant. When St. Joe furnished price information to another defendant, St. Joe had no assurance that it would be able to obtain similar price information if it requested it on another occasion.

231. St. Joe had no company policy as to furnishing or requesting price information to or from other defendants. The entire authority for pricing containers was left to its General Managers for its corrugated container plants at Port St. Joe, Florida, and Birmingham, Alabama. No one at its corporate headquarters in Jacksonville, Florida, had any responsibility for pricing specific customers, nor did they receive any reports from the General Managers showing any prices for specific customers.

232. When St. Joe furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

233. In all instances, the determination as to the price to be charged or quoted by St. Joe was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, St. Joe exercised its own business judgment.

234. St. Joe's price trends differed from those of each of its competitors, and there is no parallel between them.

235. St. Joe's price trends varied from plant to plant, as shown by comparing the price trends of its plants for 1955–1963.

236. St. Joe's prices also varied from month to month throughout the period covered by the Complaint.

## XXI

### *Findings as to St. Regis*

237. St. Regis, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, except Albemarle, Dixie, Dixie of North Carolina and Miller, although not necessarily at all times or in all areas or for all purchasers.

238. On the occasions when St. Regis considered it necessary to ascertain the accuracy of a customer's report of another defendant's price or to ascertain from another defendant the most recent price to a specific customer, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

239. When St. Regis received a request from another defendant for the most recent price to a specific customer for corrugated containers, such information was sometimes, but not always, furnished.

240. The extent and frequency with which such information was requested or furnished varied among St. Regis and the several other defendants and among plants and customers of St. Regis.

241. In the circumstances set forth in Findings 237 through 240, St. Regis requested and/or furnished price information from and/or to each of the defendants, except Albemarle, Dixie, Dixie of North Carolina, and Miller.

242. The price information requested or furnished by St. Regis related to prices charged customers in completed sales in which the customer had been billed.

243. From time to time, from and after October 1958, W. L. Diggs, as Southern District Manager for St. Regis, requested or furnished price information as described in Finding 242.

244. Price information received by St. Regis' officers or employees from other defendants was given consideration in determining the prices to be charged or quoted by St. Regis in the same manner, and with the same effect, as price information received from customers, provided the price information received from customers was considered reliable.

245. When St. Regis furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

246. In all instances, the determination as to the price to be charged or quoted by St. Regis was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, St. Regis exercised its own business judgment.

247. St. Regis' price trends differed from those of each of its competitors, and there is no parallel between them.

248. St. Regis' price trends varied from plant to plant, for 1955–1963, as shown by comparing the price trends of its plants.

249. St. Regis' prices also varied from month to month throughout the period covered by the Complaint.

## XXII

### *Findings as to Tri-State*

250. Tri-State, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, except St. Joe, although not necessarily at all times or in all areas or for all purchasers.

251. On those occasions when Tri-State considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

252. When Tri-State received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished and the information furnished was accurate.

253. In the circumstances set forth in Findings 251 and 252, Tri-State requested and/or furnished price information from and/or to each of the other defendants, except St. Joe.

254. From time to time, during the period covered by the Complaint, Alan McDonald, Sales Manager for Tri-State, requested and furnished said price information.

255. The price information requested and/or furnished by Tri-State related to consummated sales.

256. Price information received by Tri-State from other defendants was taken into account by Tri-State in individually determining the prices to be charged or quoted by it in the same manner, and with the same effect, as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

257. When Tri-State furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

258. In all instances, the determination as to the price to be charged or quoted by Tri-State was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Tri-State exercised its own business judgment.

259. Tri-State's price trends differed from those of each of its competitors, and there is no parallel between them.

260. Tri-State was cognizant of the existence of the consent decree referred to in Findings 39 through 44 hereof, and relied upon the terms thereof.

## XXIII

### Findings as to Union-Camp

261. Union-Camp, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

262. On those occasions when Union-Camp considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers. However, during the period from July 16, 1963, to October 10, 1963 (during which period Union-Camp was making a general increase in prices to its customers), Union-Camp neither requested nor furnished such price information.

263. When Union-Camp received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished it was accurate.

264. The extent and frequency with which such information was requested or furnished varied among Union-Camp and the several other defendants and among the plants and customers of Union-Camp. Union-Camp, at its Spartanburg plant, received four or five requests per week.

265. In the circumstances set forth in Findings 261 through 264, Union-Camp requested and/or furnished price information from and/or to each of the other defendants, except St. Joe.

266. The price information furnished by Union-Camp was the price at which it had sold or quoted to a specific customer. The plant managers of Union-Camp were authorized to give such price information at the request of a competitor.

267. During the time when Union-Camp furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

268. The price information received by Union-Camp from other defendants

was taken into account by Union-Camp in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as the similar price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

269. Lewis A. Wulff, from time to time, from and after July 1, 1963, until July 10, 1963, and from October 10, 1963, until October 14, 1963, as Southeastern Regional Sales Manager for Union-Camp; Frank B. Grimes, from January 1, 1960, until July 16, 1963, as Sales Manager of the Spartanburg, South Carolina, plant of Union-Camp; John I. Pritchett, during part or all of the period from December 1, 1959, until July 16, 1963, as an employee of Union-Camp, and J. E. Faulkner, Jr., from December 1, 1959, until July 16, 1963, as Sales Manager of the Jamestown plant of Union-Camp, requested and furnished said price information.

270. When Grimes, and the other Union-Camp plant managers referred to in Finding 269, furnished most recent price information to a competitor, they were following a Union-Camp policy which permitted its plant managers to give this information in the hope that, when they needed it, the competitor, in turn, would furnish such information. Grimes believed he could not expect to receive such information unless he gave it. In addition, by furnishing such information to another defendant, Union-Camp knew the source of some of the competition it would meet for a particular piece of business.

271. Union-Camp requested most recent price information to enable it to determine whether, in a particular account and at a particular time, it wanted to meet a competitor's price, quote higher, or quote lower.

272. In all instances, the determination as to the price to be charged or quoted by Union-Camp was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Union-Camp exercised its own business judgment.

273. Union-Camp's price trends differed from those of each of its competitors, and there is no parallel between them.

### XXIV

#### Findings as to West Virginia

274. West Virginia, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

275. On those occasions when West Virginia considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

276. When West Virginia received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished.

277. The extent and frequency with which such information was requested or furnished varied among West Virginia and the several other defendants and among the plants and customers of West Virginia.

278. In the circumstances set forth in Findings 275 through 277, West Virginia requested and/or furnished price information from and/or to each of the other defendants.

279. The price information requested and/or furnished by West Virginia related to prices charged customers in actual sales, or to prices quoted upon which an actual order had not at that time been received from the customer.

280. From time to time, during the period covered by the Complaint, David

B. Orcutt, Jr., Richmond District Sales Manager of West Virginia, requested and furnished price information. From time to time, from and after November, 1959, Joseph T. Piemonte, Sales Manager of the Richmond Region of West Virginia, furnished to three competitors information relating to prices charged customers in completed sales only, but he did not request any price information from others.

281. West Virginia requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by West Virginia from other defendants was taken into account by West Virginia in individually determining the prices to be charged or quoted by it in the same manner, and with the same effect, as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

282. When West Virginia furnished another defendant, upon the latter's request, price information, it did so hoping that such information would be given to it on those occasions when it might want such information.

283. When West Virginia furnished or requested such price information, it furnished such information only in response to a competitor's request, and was supplied such information only pursuant to its own specific request.

284. In all instances, the determination as to the price to be charged or quoted by West Virginia was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, West Virginia exercised its own business judgment.

285. West Virginia's price trends differed from those of each of its competitors, and there is no parallel between them.

286. West Virginia's price trends also varied from plant to plant, as shown by comparing the price trends of its plants for 1955–1963.

287. West Virginia's prices also varied from month to month throughout the period covered by the Complaint.

## XXV

### *Findings as to Weyerhaeuser*

288. Weyerhaeuser, in seeking business for the sale of corrugated containers, was in competition with each of the other defendants, although not necessarily at all times or in all areas or for all purchasers.

289. On those occasions when Weyerhaeuser considered it necessary to ascertain the accuracy of a customer's report of another defendant's price, or to ascertain from another defendant the most recent price to a specific customer for corrugated containers, such price information was usually requested from a defendant then supplying that customer with corrugated containers.

290. When Weyerhaeuser received a request from another defendant for the most recent price to a specific customer for corrugated containers, usually the information requested was furnished, and on those occasions when the information was furnished it was accurate.

291. The extent and frequency with which such information was requested or furnished varied among Weyerhaeuser and the several other defendants and among the plants and customers of Weyerhaeuser.

292. In the circumstances set forth in Findings 289 through 291, Weyerhaeuser requested and/or furnished price information from and/or to each of the other defendants.

293. The price information requested and/or furnished by Weyerhaeuser related to prices charged customers in actual sales.

294. From time to time, from and after the middle of August 1961, to October 13, 1963, George W. Elliott, Jr., Sales

Manager of the Charlotte Plant of Weyerhaeuser, and from time to time, from and after June 1962, to October 13, 1963, Ivan D. Wood, Vice-President and Manager of the Shipping Container Division of Weyerhaeuser, on occasion requested and furnished said price information.

295. Weyerhaeuser requested price information from other defendants in order to aid it in making informed pricing and marketing decisions. Price information received by Weyerhaeuser from other defendants was taken into account and utilized by Weyerhaeuser in individually determining the prices to be charged or quoted by it in the same manner, to the same extent, and with the same effect as price information which it usually and ordinarily received from purchasers, provided the price information received from purchasers was considered reliable.

296. When an employee of Weyerhaeuser made his individual decision to furnish another defendant, upon request, the most recent price charged to a specific customer for corrugated containers, he did so believing that it was unlikely that he could obtain price information from such other defendant, on those occasions when he might consider it necessary to request such information, unless he furnished price information when requested by such other defendant.

297. When Weyerhaeuser furnished or requested such price information, it furnished such information only in response to a competitor's request and was supplied such information only pursuant to its own specific request.

298. In all instances, the determination as to the price to be charged or quoted by Weyerhaeuser was its individual decision. In deciding whether to seek a particular order from a particular customer, or whether to offer to sell a particular container, and in determining the price to be charged or quoted, Weyerhaeuser exercised its own business judgment.

299. Weyerhaeuser's price trends differed from those of each of its competitors, and there is no parallel between them.

300. Weyerhaeuser's price trends also varied from plant to plant, as shown by comparing the price trends of its plants for 1955–1963.

301. Weyerhaeuser's prices also varied from month to month throughout the period covered by the Complaint.

## XXVI

*Findings with Respect to "Other Conduct" of Various Defendants*

302. In 1955, there was a meeting at the Plaza Hotel in New York, New York, at which representatives of defendant Dixie and of other non-defendant corrugated container manufacturers were present. Anthony J. Bagley, then President of Richmond Container Company (which was acquired by defendant Albemarle four years later), announced that his Company would increase its prices to American Tobacco Company. After the meeting, Bagley increased his prices to American Tobacco Company, but no one else did, and Bagley thereafter withdrew his price increase. Bagley testified that for all intents and purposes the people who attended he meeting could have stayed home.

303. Early in 1956, corrugated container manufacturers from the Baltimore area solicited business in the eastern part of Virginia for the manufacture and sale of corrugated containers at prices which in general were lower than the prices which corrugated container users in the eastern part of Virginia were then paying for similar corrugated containers. Miller, Dixie, Robert Gair Company, prior to its acquisition by Continental, Richmond Container Corporation, prior to its acquisition by Albemarle, and possibly West Virginia, endeavored to ascertain the localities in eastern Virginia in which the aforesaid Baltimore manufacturers were active, so that each could identify geographically the area in which it would be necessary to lower corrugated container prices to meet the

competition of Baltimore manufacturers. These matters were discussed by telephone and at a meeting. Thereafter, in early 1956, Miller and Richmond Container Corporation (subsequently merged into Albemarle) each adopted lower nominal board factors for eastern Virginia than for western Virginia.

304. Prior to July 1, 1959, each defendant included in its prices to many of its customers a set-up charge (Finding 49) of $15.00 for regular slotted cartons. Thereafter, and continuing into 1960, each defendant sought to increase its set-up charge for such cartons by $10.00 to many of its customers. By July 1960, each defendant included in its prices to many of its customers a set-up charge of $25.00 for regular slotted cartons. However, throughout such period, the amount of such set-up charges varied among the several defendants and among the plants and customers of individual defendants, and in many instances the amount of set-up charge sought or received, if any, was less than the aforesaid amounts.

305. In or about May or June 1959, there was a meeting at the Sir Walter Raleigh Hotel in Raleigh, North Carolina, for a period of some 20 to 30 minutes, at which representatives of Container Corporation, Dixie, Crown Zellerbach and Owens-Illinois were present. Either John I. Pritchett or J. E. Faulkner, Jr., of Highland Container Corporation (a company which then had been partially acquired by Union-Camp in March 1959, and later fully acquired in September 1959, and merged into Union-Camp in December 1959), upon entering the meeting, announced that their company was increasing its set-up charge from $15.00 to $25.00 and thereupon left the meeting.

306. On July 29, 1959, there was a meeting at Dimizzio's Restaurant in Salisbury, North Carolina, at which representatives of Carolina, Continental, Crown Zellerbach, Container Corporation, Dixie, Dixie of North Carolina, Mead, Miller and Owens-Illinois were present, and at which some of them exchanged views as to how the trade had accepted an increase in set-up charges.

307. The representative of Owens-Illinois present at the meetings at the Sir Walter Hotel and Dimizzio's Restaurant was Kenneth E. Rosenbaum.

308. The representative of Crown Zellerbach present at the meetings at the Sir Walter Hotel and at Dimizzio's Restaurant was Gordon M. Clark.

309. The representative of Container Corporation present at the meeting at Dimizzio's Restaurant was Adolphus S. Clay; the representative of Miller present was William M. Noftsinger, and the representative of Carolina present was Carter Holbrook.

310. Joseph Schwind, Sales Manager for Dixie of North Carolina, attended the meeting at Dimizzio's Restaurant. At that time he had just started as Sales Manager in Morganton, North Carolina (home office of Dixie of North Carolina), and his purpose in going was to meet his competitors. H. L. Mitchell, President of Dixie, also attended the meeting at Dimizzio's Restaurant. His primary purpose in attending was to bring Schwind and introduce him to as many of his competitors as possible.

311. H. L. Mitchell, President of Dixie, immediately after a Fibre Box Association meeting, in a conversation with Anthony J. Bagley, representing Richmond Container, suggested that Richmond Container raise its prices to Burlington Industries.

312. In August 1959, a meeting of representatives of some corrugated container manufacturers was held at the Raleigh Hotel in Richmond, Virginia. David B. Orcutt, West Virginia's District Sales Manager for the Richmond District, invited to the meeting a representative of each manufacturer that he believed was then supplying corrugated containers to Hygrade Packing Corporation. In response, representatives of Continental, Dixie, Miller, and Richmond Container Corporation, which companies, with the exception of Continental, were then supplying corrugated containers to

Hygrade, met at the Raleigh Hotel, as aforesaid. Sometime previously, West Virginia had publicly announced a general increase in its corrugated container prices of approximately 10%. Some of Hygrade's suppliers named had been advised by Hygrade that West Virginia had reduced its prices to Hygrade, and had inquired of West Virginia as to whether that report was correct in view of West Virginia's previously announced price increase policy. The meeting was called to answer these inquiries at one time. At this meeting, Mr. Piemonte, of West Virginia, explained to those present that West Virginia had not changed its previously announced general policy, but that when it had negotiated with Hygrade, it was West Virginia's good judgment that its price to that customer should be reduced 5%. No statement was made at the meeting as to what any other suppliers of corrugated containers to that customer intended to do.

313. Prior to July 27, 1961, Inland and Crown Zellerbach, among others, had announced general increases in their respective prices for corrugated containers in varying amounts, effective on varying dates. Subsequent to these public announcements, a regularly scheduled meeting of Zones 10 and 11 of the Fibre Box Association was held on July 27, 1961, at which legal counsel was present. On July 31, 1961, Lee J. Ross, then manager of the Atlantic plant of Crown Zellerbach, wrote an inter-office memorandum to his superior in that company as follows:

"As outlined in your conversation of last Friday morning, the following information was given to Paul Claus in San Francisco.

As per my letter to you of July 26, the statement as outlined was read by me to the Fibre Box Association. Inland Container also made a statement advising that there was a letter in the mail to their customers that prices would be increased a minimum of 10% on August 15.

During the meeting a phone call was received from Bill Diggs of St. Regis, and he stated that he felt his company would also support this advance in prices. No other comment was made by the representatives in attendance.

The following companies were represented:

| | | |
|---|---|---|
| Inland Container | Continental Can | Weyerhaeuser |
| Dixie Container | Union Bag | International |
| Mead | Maxwell Bros. | Paper |
| Mengel | H. & D. | |

Not in attendance:

| | |
|---|---|
| Owens-Illinois | Container Corp. |
| Carolina Container | St. Regis |
| Tri-State | Mead-Atlanta |

———————◆———————

We held a sales meeting today in Atlanta of the Atlanta sales personnel, and the price increase procedure was outlined in full."

314. In 1960 or 1961, A. S. Clay, of Container Corporation, was told by the purchasing agent at the Drexel Furniture Company that Drexel had been charged prices by other suppliers which were lower than prices charged by Container Corporation. Clay requested and received from competitors information as to the prices charged Drexel, which differed from information which Clay had received from Drexel. Subsequently, Clay asked employees of Tri-State,

Owens-Illinois, and he believes International, if they had recently reduced prices to Drexel, and Alan McDonald of Tri-State said that he had reduced his prices to Drexel by roughly 3%. Because of this price competition, Clay had lost a great deal of his business in this account. Clay expressed his intention to place his prices in a competitive position based on information given him by the purchasing agent. Subsequently, Clay reduced his prices to Drexel 5%.

315. On August 8, 1961, Robert Groner, Jr., then Regional Sales Manager of the Southern District for Continental, advised Continental's district sales managers, including Continental's New Orleans Sales Manager, that lists containing the names of customers notified of a general 10% price increase "should be compiled and should be circularized fully, since this can be made public information." On August 11, 1961, David J. Bloom, a sales manager for Mead at its Atlanta, Georgia, plant, received from Continental's New Orleans sales office such a list. Bloom had not requested the list.

316. In or about February 1962, H. L. Mitchell of Dixie and representatives of Miller, Albemarle, Continental and West Virginia met in Mitchell's office, at the latter's invitation, after the paper mills had announced a price increase for linerboard, the basic raw material for corrugated containers. Mitchell assumes he made inquiry as to whether the others had increased, or were increasing, their prices to recover these increased costs. Prior to the meeting, Continental had increased its container prices and had announced that fact to its customers, and Continental's representative at the meeting so stated. Also, prior to the meeting, West Virginia had made the decision to attempt to increase prices of containers to recover such increased cost, and its representative so stated at the meeting. "The meeting broke up as if it had not started." At about this same time, the other defendants attempted to increase prices in varying amounts to some corrugated container customers in an effort to recover their increased costs of linerboard.

317. H. L. Mitchell of Dixie believed that after some competitors had discontinued giving and receiving the most recent price charged or quoted to specific customers, the prices of corrugated containers, in some instances, deteriorated 40 per cent simply for lack of communication.

318. David B. Orcutt, Jr., was the representative of West Virginia who attended the meeting in the office of Mitchell, President of Dixie, described in Finding 316. Prior to the meeting, West Virginia had decided to attempt to increase its prices sufficiently to recover the increased cost of linerboard, as previously announced by the linerboard mills, and Orcutt stated at the meeting that West Virginia personnel had been instructed to do so. Orcutt did not know whether the other defendants whose representatives attended the meeting attempted to increase their prices.

319. Robert Groner, Jr., and Jehan B. Johnson were the representatives of Continental who attended the meeting in the office of Mitchell, President of Dixie, described in Finding 316. Prior to the meeting, Continental had publicly announced an increase in prices of its corrugated containers in order to absorb the increased cost represented by the rise in the price of linerboard. Since Continental's price increase could not hold if its competitors did not increase their prices, Johnson was interested in knowing what his competitors were doing or had been doing.

320. Harold P. Kyle and William M. Noftsinger were the representatives of Miller who attended the meeting in the office of Mitchell, President of Dixie, described in Finding 316. Kyle's purpose in attending the meeting was to learn his competitor's attitude toward passing on to customers the increase in the cost of linerboard.

321. Robert Groner, Jr., representative of Continental, on or about June 30, 1961, at a meeting of the Fibre Box As-

sociation attended by one or more of the other defendants and the Fibre Box Association's counsel, delivered a speech in which he stated Continental's intention to abide by the antitrust laws. Groner announced certain of Continental's sales policies, and stated that Continental would attempt to sell its product at a profit. He noted that one of the causes of unprofitable pricing was the deception practiced on salesmen by purchasing agents when those purchasing agents were asked the price which they were currently paying for corrugated containers. He said that, in view of this deception, his company would endeavor to determine the most recent price charged to a new customer before quoting blindly. Groner's speech made no reference to specific customers. Groner said that "anyone who has any real or imaginary problems with our firm can call me," and stated that such conversations would be "strickly [sic] legal according to the interpretation of the law by Malcolm White [Whyte]," the General Counsel of the Fibre Box Association.

322. Anthony J. Bagley met with competitors in the office of Herbert Mitchell, President of Dixie, on at least three occasions and discussed the price level of corrugated containers in the Richmond, Virginia, area. There is no evidence when these meetings occurred nor that any other defendant was present.

323. On various dates between July 24, 1961, and August 31, 1961, Continental, Container Corporation, Crown Zellerbach, Mead, Owens-Illinois, Union-Camp and West Virginia publicly announced general increases in varying amounts in their respective prices of corrugated containers to take effect on September 1, 1961, and Inland and St. Regis publicly announced general increases in varying amounts in their respective prices of corrugated containers to take effect on August 15, 1961. Each of the defendants attempted to increase its prices to the majority of its corrugated container customers, and succeeded in increasing prices to some of its customers in varying amounts. Continental had publicly announced its price increase prior to August 11, 1961. On August 24, 1961, Robert Groner, Jr., attended a Fibre Box Association meeting at which one or more of the defendants were present. Groner, who had a duty to gather market information for Continental, reported to his superior that "the feeling at this meeting was that the price increase * * * would probably hold." Groner instructed his district sales managers to make no deviations from Continental's previously announced increase without specific permission.

324. On one occasion, when Container Corporation received from Continental the most recent price which Continental had charged to a specific customer, Container Corporation analyzed Continental's price against Container Corporation's costs, determined that Container Corporation could charge less and still have a comfortable profit, and cut Continental's price. An employee of Continental complained to an employee of Container Corporation, but Continental continued giving price information to Container Corporation when such information was requested.

325. After a zone meeting of the Fibre Box Association, Barnell E. Roberts, Sales Manager of Inland's Macon, Georgia, plant, stated in the presence of several representatives of other defendants that he was going to increase his prices to Spring Cotton Mills. Roberts said nothing further. Roberts had not decided to make this announcement prior to making it. No comment was made by any of the others present regarding the announcement. Roberts sought no agreement, and stated that he would make no agreement. He expected that the others would not increase their prices. They did not. Inland did and lost the business. Later Inland reduced its prices to get back into the account.

326. In or about 1961, Weyerhaeuser, at the request of Continental, furnished Continental the most recent price that Weyerhaeuser had charged a certain account. After obtaining this information,

Continental quoted a more attractive price to this account and took the business from Weyerhaeuser. Weyerhaeuser naturally was unhappy that it no longer had the business. Subsequently, upon inquiry from Weyerhaeuser, Continental confirmed that it had taken the account at a lower price. Weyerhaeuser thereafter attempted to regain the account.

## DISCUSSION

The issues for determination are whether from the facts found, (1) the defendants, during the period covered by the Complaint, had an understanding or agreement to exchange information as to the most recent prices charged or quoted to specific customers, and (2) if so, during said period, did the defendants have a further understanding and agreement to use such exchanged price information for the purpose and with the effect of maintaining substantially identical price quotations to specific customers or minimizing the amount of any price reductions to be offered to such customers. It is the contention of the plaintiff, if these two issues are resolved in the affirmative, that the concerted and reciprocal conduct of the defendants constitutes, as a matter of law, a combination or conspiracy in the restraint of trade in the sale of corrugated containers within the meaning of Section 1 of the Sherman Act.[1] If an unlawful trade conspiracy has otherwise been established, a further question is presented as to whether the provisions of the consent decree entered in the case of "United States of America, Plaintiff, against National Container Association, et al., Defendants," in the United States District Court for the Southern District of New York, Civil Action No. 8–318, constitutes a defense available to any of the defendants.

▪ The plaintiff concedes that there is no evidence of an express agreement or understanding between or among any of the defendants to either exchange price information or to restrict price competition. It is contended, however, that, from the facts found, the Court may infer an agreement to exchange information as to the price most recently quoted or charged for corrugated containers, and that from such agreement, together with such facts, the Court may infer an agreement to restrict price competition. Since it is well established that a conspiracy can be inferred or implied from a concerted and collaborative course of action, plaintiff correctly asserts that an explicit agreement is not a necessary part of a Sherman Act conspiracy. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

Unquestionably, during all or a part of the period covered by the Complaint, each of the defendants furnished to other defendants, upon request, the most recent price charged or quoted to specific customers for corrugated containers, and this was done with the implied understanding that by furnishing such information each defendant would, upon request, receive similar information. The evidence also permits the inference that each of the defendants knew that this practice was engaged in to some extent by other defendants. Since each defendant gave price information to other defendants with the expectation that the same kind of information would be furnished by the competitor, reciprocally, when requested, the plaintiff contends that a combination and conspiracy has been proved. The defendants, on the other hand, earnestly contend that the uncontested facts negate any inference of an agreement.

▪ The Court is of the opinion that the plaintiff has failed to sustain its burden of proving facts from which an agreement to exchange price informa-

[1]. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides, in pertinent part, as follows:

"Every contract, combination in the form of trust or otherwise, or con-spiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

tion may be inferred. Before determining the price to be quoted to a specific purchaser for corrugated containers, each defendant was naturally interested in all pertinent marketing information applicable to such account, and it was important to each manufacturer to have accurate information as to the price alternatives available to the purchaser. Usually, such information was obtained from the defendants' own records of prior sales, or from the purchaser involved. However, on occasions, purchasers furnished manufacturers with incomplete, inaccurate or misleading information as to prices offered by competing suppliers, and it was only on these occasions that a competitor was consulted with respect to price information. The extent and frequency with which such information was requested or furnished varied among the plants and customers of each of the defendants. The defendants were at all times free to request from or furnish to competitors, or not request from or furnish to competitors, information as to prices for corrugated containers, and whether or not to request or furnish such information was the individual decision of each defendant. At various times during the period covered by the Complaint, some of the defendants discontinued the practice altogether. Price information was furnished only in response to a specific request therefor, and was never volunteered. The price communication among the defendants was infrequent, since the usual means for obtaining such information was from a defendant's own records or from a customer. The undisputed fact that each defendant "usually" furnished price information on request disproves any agreed requirement that such information would always be furnished. There was a lack of uniformity in the substance and scope of price information furnished. Sometimes it was furnished in terms of end prices, and sometimes in terms of board levels. Some defendants furnished it both ways, while others furnished it in terms of an end price only. Some defendants furnished only a price which had been charged to a customer in a consummated sale, while others made no distinction between consummated sales and prices previously quoted.

The conceded freedom of each defendant to request from or furnish to competitors, or not request from or furnish to competitors, price information on corrugated containers, is the very antithesis of an agreement. Proof of a course of conduct by the defendants, or parallel business behavior, does not necessarily require an inference or conclusion that a conspiracy actually existed. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). The most that can be said about the conduct of the defendants in exchanging price information is that on *infrequent* occasions each of the defendants, during various periods, felt free to call upon competitors to *verify* price information given by purchasers, and by receiving such information, felt compelled to give similar information upon request. Since this was done with no regularity, and each defendant was at all times completely free to either furnish or not furnish such information, it cannot be said that the existence of any agreement or conspiracy should be inferred.

Even if the mere giving and receiving of price information could support an inference of an agreement or conspiracy to do so, this alone would not be a violation of the Sherman Act. The plaintiff concedes that if it had only charged in the Complaint that the defendants had agreed to exchange price information, it would have no case, and that the Complaint would be subject to dismissal. Thus, the plaintiff has the additional burden of showing that from such inferred agreement, the Court should further infer that there was an agreement to use such exchanged price information for the purpose and with the effect of maintaining substantially identical price quotations to specific customers, or minimizing the amounts of any price reductions to be offered to such customers.

In arguing that a preponderance of the evidence establishes that the defendants combined and conspired to exchange most recent prices charged or quoted to specific customers for the purpose and with the effect of maintaining identical price quotations to those customers, or minimizing the amount of any reduction in price to be offered, plaintiff points to the stipulated evidence that each defendant considered it beneficial to have the most recent prices charged or quoted to specific customers for corrugated containers by its competitors; that the price information thus obtained was utilized in making the determination as to what price would be quoted to the customer; that one of the defendants felt that such price information was important to the defendants to keep the market stable; that most defendants felt that such price information was needed to maintain prices and minimize any price competition that might otherwise exist; that some defendants hinted that the price information was used to get the best possible prices from their customers, and other evidence of similar import. The plaintiff also contends that the asserted freedom by recipients of price information to use their own discretion in setting prices is meaningless for the reason that a decision to quote a price other than identical, or marginally under, the price of the competitor, would be wholly irrational, if the recipient was interested in sharing the business. Plaintiff further asserts that if the direct evidence does not establish that the practice of the defendants in exchanging most recent prices charged or quoted to specific customers had the purpose and necessary effect of stabilizing prices and minimizing competition among defendants, the "other conduct" evidence relating to various defendants (Findings 302 through 326) makes such conclusion inescapable. It is not contended, however, that this "other conduct" evidence establishes a separate violation of the antitrust laws.

The record is barren of any evidence that any of the defendants were ever committed to a common scheme in fixing prices to be charged or quoted a customer. On the contrary, it is conceded that the corrugated container business was highly competitive, and that each defendant, in deciding whether to seek a particular order from a particular customer, and in determining the price to be charged or quoted, exercised its own business judgment. Purchasers frequently shifted their business from one supplier to another. Each defendant was constantly losing old accounts and acquiring new ones. Defendants' business records indicate independent and unrestricted price competition. Many factors other than the latest price quoted or charged entered into individual decisions as to whether to seek a particular order from a particular customer, and in determining the price to be quoted (Findings 22 and 23).

Plaintiff does not challenge the right of the defendants to obtain and use reliable market information for the purpose of maximizing sales and profits, but argues that cooperative and reciprocal action between and among competitors for the purpose of stabilizing prices is to impose an undue restraint upon free competition protected by the Sherman Act. However, this argument does not take into account the fact that, while engaged in such "cooperative and reciprocal action," each defendant exercised its own business judgment with respect to the desirability of an order from a particular customer, or the fact that the price to be quoted, whether higher, lower, or the same, was the individual decision of each defendant. There is no evidence that any defendant ever discussed with any other defendant the desirability, the frequency, or the consequences of requesting or furnishing, or failing to request or furnish, price information, or the action to be taken with respect to such information. This freedom of action reserved by each defendant completely refutes the charge that it was the common purpose of the defendants, in exchanging price information, to maintain prices which would be substantially

identical with the prices of another, to minimize price reductions, or otherwise make concerted use of any price information after it had been obtained. The exchange of most recent price information is not illegal merely because it enables the recipient to compete on the basis of fuller market information, so long as each competitor, although taking into account the price information received from a competitor, independently established its own price.

■ Neither has the plaintiff proved its charge that the exchange of most recent price information had the *effect* of maintaining substantially identical price quotations to specific customers, or minimizing the amount of any price reductions to be offered to such customers. No evidence was adduced by the plaintiff from any corrugated container customer in the Southeastern United States showing, or in any way indicating, that prices charged by any one or more of the defendants was stabilized or harmonized by the exchange of price information, or indicated any uniformity or parallelism of prices between or among two or more of the defendants. Actually, the uncontested statistical data in the record demonstrates the absence of any uniformity, harmony, stability or parallelism in prices. Price trends varied widely among the several defendants and among the plants of the individual defendants, both as to direction and as to degree. While the price trends of some plants were moving upward, those of other plants were moving downward. It has been stipulated that during the period covered by the Complaint, the price trend of all corrugated containers was downward, and was substantially the same at the end of the period as at the beginning thereof, in contrast to the increase in prices for the same period for paper and allied products generally. Further, during the same period, labor rates, machinery and equipment costs, and other production costs, for both corrugated containers and containerboard, increased. Another important factor is that the price information received from other defendants was taken into account and utilized by each defendant in individually determining the price to be charged or quoted by it in the same manner, to the same extent, and with the same effect as the similar price information which it usually and ordinarily received from purchasers. Consequently, if purchasers had always given accurate and reliable information, there would have been no necessity for calling upon a competitor for verification, and the price structure in the corrugated container business would have been the same as if no price information had ever been exchanged with competitors. It is difficult to understand how the infrequent exchange of price information between competitors for verification purposes could constitute an unlawful conspiracy in restraint of trade when the identical price structure would have been maintained, free of any illegality, had customers been accurate and reliable in reporting the same information. In all instances, the price information, from whatever source, merely permitted the recipient to make its independent pricing decision based on this and numerous other factors. The gathering of price information, from whatever source, which enables "sellers to prevent the perpetration of fraud upon them, which information they are free to act upon or not as they choose, cannot be held to be an unlawful restraint upon commerce * * *." Cement Manufacturers Protective Ass'n v. United States, 268 U.S. 588, 603, 604, 45 S.Ct. 586, 591, 69 L.Ed. 1104 (1925).

In support of its claim that proof of an unlawful conspiracy has been established, plaintiff relies principally upon American Column and Lumber Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921), and United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035 (1923). The defendants contend that the facts in this case more nearly resemble the facts in Maple Flooring Mfrs' Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), and Cement

Mfrs. Protective Assn. v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925), and that these decisions should be controlling. We must, of course, "in considering the application of the rule of decision in these cases to the situation presented by this record," bear in mind that "each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record," and that prior opinions in such cases "must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied." Maple Flooring Mfrs' Ass'n v. United States, supra, 268 U.S. at 579, 45 S.Ct. at 583.

In *American Column*, the defendant Association adopted a plan which required each member to make the following six reports to the Secretary:

"1. A *daily* report of all sales actually made, with the name and address of the purchaser, the kind, grade and quality of lumber sold and all special agreements of every kind, verbal or written with respect thereto. 'These reports to be exact copies of orders taken.'

2. A *daily* shipping report, with exact copies of the invoices, all special agreements as to terms, grade, etc. The classification shall be the same as with sales.

3. A *monthly* production report, showing the production of the member reporting during the previous month, with the grades and thickness classified as prescribed in the Plan.

4. A *monthly* stock report by each member, showing the stock on hand on the first day of the month, sold and unsold, green and dry, with the total of each kind, grade and thickness.

5. Price-lists. Members must file at the beginning of each month price-lists showing prices f. o. b. shipping point, which shall be stated. New prices must be filed with the association as soon as made.

6. Inspection reports. These reports are to be made to the association by a service of its own, established for the purpose of checking up grades of the various members and the 'Plan' provides for a chief inspector and sufficient assistants to inspect the stocks of all members from time to time." (257 U.S. at 394, 395, 42 S.Ct. at 115).

All the reports by members were "subject to complete audit by representatives of the association," and any member who failed to report was not to "receive the reports of the secretary," and "failure to report for twelve days in six months" caused the member "to be dropped from membership." The Secretary was required to send to each member a "monthly summary showing the production of each member for the previous month," a "weekly report * * * of all sales * * * giving each sale and the price, and the name of the purchaser," and "a monthly report, showing the individual stock on hand of each member and a summary of all stock, * * * sold and unsold." Additionally, not later than the 10th of each month the Secretary was required to "send a summary of the price-lists furnished by members, showing the prices asked by each * * *." Membership meetings were held once a month for the purpose of affording "opportunity for the discussion of all subjects of interest to the members." (257 U.S. at 395, 396, 397, 42 S.Ct. at 115, 116).

The record disclosed a concerted, systematic effort, directed by the Secretary and participated in by members of the Association, to cut down production and increase prices. While the plan was in effect, "the prices of the grades of hardwood in most general use were increased to an unprecedented extent * * *." For example, in one year, "the increases in prices of varieties of oak [ranged] from 33.3% to 296%"; gum increases ranged from "60% to 343%," and ash increases ranged from "55% to 181%." (257 U.S. at 409, 42 S.Ct. at 120). The court, in

holding this concerted effort was unlawful, said:

"Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals, as the defendants did; they do not contract, as was done here, to submit their books to the discretionary audit, and their stocks to the discretionary inspection, of their rivals, for the purpose of successfully competing with them; and they do not submit the details of their business to the analysis of an expert, jointly employed, and obtain from him a 'harmonized' estimate of the market as it is, and as, in his specially and confidentially informed judgment, it promises to be. This is not the conduct of competitors, but is so clearly that of men united in an agreement, express or implied, to act together and pursue a common purpose under a common guide that, if it did not stand confessed a combination to restrict production and increase prices in interstate commerce, and as, therefore, a direct restraint upon that commerce, as we have seen that it is, that conclusion must inevitably have been inferred from the facts which were proved." (257 U.S. at 410, 42 S.Ct. at 120).

The opinion of the court in *American Column* rests squarely on the proposition that the purpose and effect of the activities of the members "were to restrict competition, and thereby restrain interstate commerce in the manufacture and sale of hardwood lumber, by concerted action in curtailing production and in increasing prices * * *." (257 U.S. at 412, 42 S.Ct. at 121).

Obviously, the facts present in this case do not remotely resemble the facts in *American Column*. The defendants here were under no compulsion to give or receive price information, since each defendant was free at all times to do as he pleased in this regard. No defendant was privileged to audit the books of another defendant, nor to be furnished with other business details of their rivals.

No fines or penalties were assessed for a failure or refusal to furnish price information, and there was no compulsion to *adhere* to the price requested or received. Price information was given and received on infrequent occasions, and related to only a small percentage of sales, as contrasted to disclosure of price information on all sales.

In *American Linseed Oil*, the other case relied upon by the plaintiff, twelve corporate defendants entered into an agreement, with provisions for financial forfeitures in the event of its violation, for the maintenance of a bureau to gather and distribute information among the members, including price list covering the production of members. Members agreed to furnish to the bureau a schedule of all prices and terms, and were required to report by telegraph all variations of prices, the names of prospective buyers, the point of shipment, the exact prices, terms and discounts, and other pertinent information relating to sales and prices. All such information was to be treated as confidential and concealed from buyers. The information thus gathered was made available to members through the statistical surveys by the bureau. It was provided that any subscriber who had offered his product to a prospective buyer who did not purchase should have the right to advise the bureau of the "unsuccessful offering or quotation," and to request the bureau "to bulletin all of its subscribers asking specific information regarding any quotation or sale to such prospective buyer by any of the other subscribers * * *." (262 U.S. at 385, 43 S.Ct. at 610). Members were required to give the desired information. In holding that the plan, as operated by the defendants, constituted a violation of the Sherman Act, the court said:

"The record discloses that defendants, large manufacturers and distributors, powerful factors in the trade, of commodities restricted by limited supplies of raw material (linseed), located at widely separated points, and theretofore conducting independent enter-

prises along customary lines, suddenly became parties to an agreement which *took away their freedom of action* by requiring each to reveal to all the intimate details of its affairs. All subjected themselves to an autocratic bureau, which became organizer and general manager, paid it large fees, and deposited funds to insure their obedience. Each subscriber *agreed to furnish a schedule of prices and terms and adhere thereto,* unless more onerous ones were obtained, until prepared to give immediate notice of departure therefrom for relay by the bureau. Each also agreed, under penalty of fine, to attend a monthly meeting and report upon matters of interest to be there discussed, to comply with all reasonable requirements of the bureau, and to divulge no secrets.

With intimate knowledge of the affairs of other producers, and obligated as stated, but proclaiming themselves competitors, the subscribers went forth to deal with widely separated and unorganized customers necessarily ignorant of the true conditions. Obviously they were not *bona fide* competitors; their claim in that regard is at war with common experience, and hardly, compatible with fair dealing." (262 U.S. at 389, 390, 43 S.Ct. at 611). (Emphasis supplied).

Here again, the facts in *American Linseed Oil* are materially dissimilar to the facts in the case under consideration. We have no agreement that took away "any freedom of action" of the defendants by *requiring* the furnishing of price schedules and terms, and *adherence* thereto; no agreement, under penalty of fine, to attend meetings and report upon matters of interest; and no agreement to comply with the requirements of any organization, or not to divulge any trade secrets. The opposite is true. As we have seen, each defendant was at all times free to exchange, or not to exchange, price information, and each price charged or quoted was the individual decision of each defendant.

Subsequent to the decision in *American Column* and *American Linseed Oil,* the Supreme Court, in Maple Flooring Mfrs' Association v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925), and Cement Mfrs. Protective Assn. v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925), had occasions to again consider the legality of the dissemination of price information among competitors. In each of these cases, it was found that the conduct of the defendants did not have the purpose or effect of restraining trade.

In *Maple Flooring,* the corporate defendants organized a trade association for the purpose of (1) computing and distributing among the members "the average cost to association members of all dimensions and grades of flooring," (2) compiling and distributing among members "a booklet showing freight rates on flooring from Cadillac, Mich., to [and] between 5,000 and 6,000 points of shipment in the United States," (3) gathering statistics which were supplied, at frequent intervals, "by each member of the association to the secretary of the association giving complete information as to the quantity and kind of flooring sold and prices received by the reporting members, and the amount of stock on hand, which information [was] summarized by the secretary and transmitted to members without, however, revealing the identity of the members in connection with any specific information thus transmitted," and (4) conducting meetings "at which the representatives of members congregate and discuss the industry and exchange views as to its problems." There was no "agreement among the members of the association either affecting production, fixing prices, or for price maintenance." Members were "left free to sell their product at any price they [chose] and to conduct their business as they [pleased]." Although the Government claimed that the activities of the defendants "resulted in the maintenance of practical uniformity of net delivered prices as between the several corporate defendants," there was

no evidence "to establish such uniformity," or "that any substantial uniformity in price had in fact resulted from the activities of the association * * *." Neither was there any "direct proof that the activities of the association had affected prices adversely to consumers." Further, the undisputed evidence disclosed "that the prices of members were fair and reasonable and that they were usually lower than the prices of non-members * * *." (268 U.S. at 566, 567, 568, 45 S.Ct. at 579).

In rejecting the Government's argument that the necessary effect of the activities of the defendants was to "bring about a concerted effort on the part of members of the Association to maintain prices at levels having a close relation to the average cost of flooring reported to members," and such activities "should be enjoined regardless of [their] actual operation and effect so far as price maintenance [was] concerned," the court stated:

"We do not conceive that the members of trade associations become such conspirators merely because they gather and disseminate information, such as is here complained of, bearing on the business in which they are engaged and make use of it in the management and control of their individual businesses; nor do we think that the proper application of the principles of decision of Eastern States Retail Lumber [Dealers'] Association v. United States [234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490], or American Column & Lumber Co. v. United States, or United States v. American Linseed Oil Company, leads to any such result. The court held that the defendants in those cases were engaged in conspiracies against interstate trade and commerce because it was found that the character of the information which had been gathered and the use which was made of it led irresistibly to the conclusion that they had resulted, or would necessarily result, in a concerted effort of the defendants to curtail production or raise prices of commodities shipped in interstate commerce. The unlawfulness of the combination arose, not from the fact that the defendants had effected a combination to gather and disseminate information, but from the fact that the court inferred from the peculiar circumstances of each case that concerted action had resulted or would necessarily result in tending arbitrarily to lessen production or increase prices.

Viewed in this light, can it be said in the present case that the character of the information gathered by the defendants, or the use which is being made of it, leads to any necessary inference that the defendants either have made or will make any different or other use of it than would normally be made if like statistics were published in a trade journal or were published by the Department of Commerce, to which all the gathered statistics are made available? The cost of production, prompt information as to the cost of transportation, are legitimate subjects of enquiry and knowledge in any industry. So likewise is the production of the commodity in that industry, the aggregate surplus stock, and the prices at which the commodity has actually been sold in the usual course of business." (268 U.S. at 584, 585, 45 S.Ct. at 585).

Clearly, the information given and received by the defendants in this case was far more limited in scope, and with less frequency, than in *Maple Flooring*. Under such circumstances, together with the failure of the plaintiff to offer any proof that the communications actually restricted price competition, or that the exchanged price information was used differently from like information gathered from other sources, plaintiff's challenge to defendants' conduct must fail.

In *Cement Manufacturers*, decided the same day as *Maple Flooring*, the court held an Association of Cement Manufacturers, organized for the purpose of exchanging trade statistics, to be legal, since the evidence did not show that the arrangement had the purpose or, effect

of restricting trade. The avowed purpose for organizing the Association was to collect and disseminate *accurate* information "to protect each manufacturer against misrepresentation, deception and imposition * * *." The members were required to report to the Secretary of the Association "all specific job contracts," including "name and address of the purchaser," the "amount of cement required," and the "price and delivery point," which was in turn communicated to the other members. (268 U.S. at 591, 596, 45 S.Ct. at 587, 588).

In reversing the trial court, which held that the activities of the defendants tended to limit the amount of cement produced and distributed, and to produce uniformity in price, thus imposing a restraint of commerce, the court stated:

"From these various activities of the defendants, the government deduces a purpose to control the price of cement which it is charged was to be accomplished by the control of the supply of cement on the market and by intimate association of the defendants in the exchange of information and a ready means of quoting a delivered price at any point. Cement was to be kept from the market by the use of the specific job contract accompanied by the systematic gathering and reporting of information with reference to the specific jobs and the amount of cement required for their completion. The two essential elements in the conspiracy to restrain commerce charged therefore are: (a) The gathering and reporting of information which would enable individual members of the association to avoid making deliveries of cement on specific job contracts which by the terms of the contracts they are not bound to deliver; and (b) *the gathering of information as to production, price of cement sold on specific job contracts,* and transportation costs not differing essentially from similar information disseminated by the Maple Flooring Association which is the subject of the opinion in Maple Flooring [Mfrs'] Association v. United States

[268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093], decided today.

That a combination existed for the purpose of gathering and distributing these two classes of information is not denied. That a consequence of the gathering and dissemination of information with respect to the specific job contracts was to afford, to manufacturers of cement, opportunity and grounds for refusing deliveries of cement which the contractors were not entitled to call for,—an opportunity of which manufacturers were prompt to avail themselves—is also not open to dispute. We do not see, however, in the activity of the defendants with respect to specific job contracts any basis for the contention that they constitute an unlawful restraint of commerce. The government does not rely on any agreement or understanding among members of the association that members would either make use of the specific job contract, or that they would refuse to deliver 'excess' cement under specific job contracts. *Members were left free to use this type of contract and to make such deliveries or not as they chose,* and the evidence already referred to shows that in 1920 padded specific job contracts were cut down something less than two-thirds of the total amount of the padding as a result of the system of gathering and reporting this information. It may be assumed, however, if manufacturers take the precaution to draw their sales contracts in such form that they are not to be required to deliver cement not needed for the specific jobs described in these contracts, that they would, to a considerable extent, decline to make deliveries, upon receiving information showing that the deliveries claimed were not called for by the contracts. Unless the provisions in the contract are waived by the manufacturer, demand for and receipt of such deliveries by the contractor would be a fraud on the manufacturer, and in our view *the gathering and dissemination of information which will enable*

*sellers to prevent the perpetration of fraud upon them, which information they are free to act upon or not as they choose, cannot be held to be an unlawful restraint upon commerce,* even though in the ordinary course of business most sellers would act on the information and refuse to make deliveries for which they were not legally bound. (268 U.S. at 602, 603, 604, 45 S.Ct. at 591). (Emphasis supplied).

Similarly in this case, the evidence establishes that the communication of price information was often, if not exclusively, for the purpose of verifying information obtained from buyers, and that defendants were at all times free to use the information as they chose. Equally important, the rationale of *Cement Manufacturers* is inapplicable here as the evidence fails to show that price information obtained by any defendant from a competitor had any effect on prices, except for its natural influence on individual action.

After a reading of all the cases, those cited by the plaintiff as well as those cited by the defendants, and comparing the facts in each case with the record in this case, the Court is led to the inescapable conclusion that no court has yet held communications of price information similar to those here at issue to be a violation of the Sherman Act. No express agreement to restrict price competition can be found in the record, and none can be inferred when every price decision by every defendant was its own individual decision, unrestricted by agreement. This is particularly true in view of the vigorous and continuous price competition of the defendants, and the admitted price structure in the corrugated container industry.

Little need be said about the other issues. The Government concedes that the activity of the Fibre Box Association is protected by *Maple Flooring*. The 1940 consent decree, even if relied upon by some or all of the defendants, is of little consequence. It does not legalize unlawful conduct. It simply permits

the gathering and dissemination of information as to the cost of manufacture of corrugated containers, the actual price which the product has brought in past transactions, etc., so long as such activities are carried on without "reaching or attempting to reach any agreement or any concerted action with respect to price or production of such containers." The plaintiff concedes that an exchange of price information without an agreement to restrict price competition would be lawful, and the defendants admit that an exchange of such information, coupled with an agreement to restrict price competition, would be unlawful. In any event, since no agreement has been found to either exchange price information, maintain substantially identical price quotations to specific customers, or to minimize the amount of any price reductions to be offered to such customers, the consent decree has no relevancy.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. The evidence in this case does not prove or support an inference that there was an agreement or understanding among the defendants, or any of them, to exchange, or furnish upon request, information as to the most recent price charged or quoted to specific customers for corrugated containers.

3. The evidence in this case does not prove or support an inference that there was an agreement or understanding among the defendants, or any of them, to exchange, or to furnish upon request, information as to the most recent price charged or quoted to specific customers for corrugated containers, for the purpose of maintaining substantially identical price quotations to specific customers or minimizing the amount of any price reductions to be offered to such customers.

4. The requesting and furnishing of price information by the defendants did not have the effect of eliminating, reducing, minimizing or restricting price competition.

5. The plaintiff is not entitled to the injunctive relief sought in the Complaint.

6. The defendants are entitled to a judgment dismissing the Complaint with prejudice.

A judgment will be entered accordingly.